TODD A. ROBERTS (SBN 129722)
NICOLE S. HEALY (SBN 157417)
ROPERS, MAJESKI, KOHN & BENTLEY
1001 Marshall Street, Suite 500
Redwood City, CA  94063-2052
Telephone:     (650) 364-8200
Facsimile:      (650) 780-1701
Email: todd.roberts@rmkb.com
          nicole.healy@rmkb.com

Attorneys for Defendants
TLC RESIDENTIAL, INC., a corporation, and
FRANCISCO MONTERO, an individual

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS E. PEREZ, Secretary of Labor, United States Department of Labor,<br><br>Plaintiff,<br><br>v.<br><br>TLC RESIDENTIAL, INC. a corporation, and FRANCISCO MONTERO, an individual,<br><br>Defendants. | Case No.  15-cv-02776-WHA<br><br>**DECLARATION OF DR. DOUGLAS POLCIN, ED.D. IN SUPPORT OF DEFENDANTS TLC RESIDENTIAL, INC. AND FRANCISCO MONTERO'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Date:     September 22, 2016**<br>**Time:    8:00 a.m.**<br>**Ctrm.:   8 – 19th Floor**<br><br>**Judge: Hon. William H. Alsup** |

I, Douglas Polcin, Ed.D., declare:

1.     I make this Declaration based on my own personal knowledge, except where otherwise so indicated.  The matters that follow are true and correct to the best of my knowledge.

2.     I have been employed by the Alcohol Research Group as a senior scientist from 2005 through the present.  While with the Alcohol Research Group, I have served as the Principal Investigator and Co-investigator on National Institutes of Health studies.

3.     The Alcohol Research Group conducts epidemiological, treatment, and recovery studies of alcohol and drug problems and services.  Its predecessor entity was initially founded in 1959 by Dr. Wendell Lipscomb, a physician and epidemiologist and Dr. Genevieve Knupfer, a psychiatrist and sociologist, who launched the California Drinking Practices Study with a grant

from the National Institute of Mental Health to the California State Department of Public Health. Since 1994, Alcohol Research Group has been a part of the Oakland-based non-profit Public Health Institute. Over time, the organization has focused on research into alcohol and drug use, abuse and treatment. In February 2016, the Alcohol Research Group received a $7.3 million, five year grant from the National Institute on Alcohol Abuse and Alcoholism to support the continuation of its National Alcohol Research Center.

4. I received my Ed.D. degree in Counseling Psychology: Leadership from Northeastern University, Boston-Bouve' College of Human Development, Boston, Massachusetts in 1991. I was a Postdoctoral Fellow: Health Services and Public Health Research from 1996-99 at the University of California, Berkeley, School of Public Health, Berkeley, California. I received my M.S. degree in Clinical Psychology in 1982 from San Francisco State University, San Francisco, California, and my B.Ph. degree in Psychology in 1979 from Grand Valley State Colleges, Thomas Jefferson College, Allendale, Michigan.

5. Between 1993 and 2009, I taught undergraduate, graduate, and continuing education courses relating to counseling and substance abuse treatment. I have also been a licensed therapist in private practice and for state and local agencies.

6. I have conducted research in the field of substance abuse and recovery for over 20 years. During that time, I have written over 90 articles, approximately 75 of which have been published in peer-reviewed journals, and have given approximately 40 presentations on these topics. I have also served as an editorial board member and a peer reviewer for scientific journals addressing substance abuse, addiction, and treatment. I have been the principal investigator or co-investigator for a number of research studies concerning substance abuse and addiction treatment and recovery, some of which involved sober living homes or recovery residences. A complete list of these articles, presentations, and studies is included in my *curriculum vitae*, a true and correct copy of which is attached hereto as Exhibit 1.

7. My research includes studying the effects of various factors on recovery from substance abuse. Among other things, I have conducted research concerning the impact on recovery outcomes for individuals living in sober living homes or recovery residences.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

8.   Much of my research has been funded by grants from the National Institutes of Health, including the National Institute on Drug Abuse and the National Institute on Alcohol Abuse and Alcoholism.  Among these studies is a five-year longitudinal study of sober living homes titled "*An Evaluation of Sober Living Houses*," which was funded by a grant from NIH, which began in 2000.  The study focused on residents' success in maintaining their sobriety, and investigated factors that were outcome predictive.

9.   Attached hereto are true and correct copies of certain papers for which I was a co-author concerning, among other things, the role of sober living homes on recovery from substance abuse and addiction.

   a.   Attached hereto as Exhibit 2 is a true and correct copy of a paper titled Douglas L. Polcin, Ed.D., Rachael Korcha, M.A., Jason Bond, Ph.D., & Gantt Galloway, Pharm.D.: *What Did We Learn from Our Study on Sober Living Houses and Where Do We Go from Here?*, 42 J. Psychoactive Drugs, vol. 4, 425-433 (Dec. 2010), *available at* http://www.ncbi.nlm.nih.gov/pubmed/21305907 ("*What Did We Learn*").

   b.   Attached hereto as Exhibit 3 is a true and correct copy of a paper titled Rachael A. Korcha, Douglas L. Polcin, Amy A. Mericle, & Jason Bond: *Sober Living Houses: Research in Northern and Southern California*, J. Addiction Science & Clinical Practice, 10 (Suppl. 1): A30 (Feb. 2015), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4347505/  ("*Sober Living Homes*").

   c.   Attached hereto as Exhibit 4 is a true and correct copy of a paper titled Douglas L. Polcin, Ed.D., MFT & Diane Henderson, B.A., *A Clean and Sober Place to Live: Philosophy, Structure, and Purported Therapeutic Factors in Sober Living Houses*, 40 J. Psychoactive Drugs, vol. 2, 153-159 (2008), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2556949/ ("*A Clean and Sober Place*").

   d.   Attached hereto as Exhibit 5 is a true and correct copy of a paper titled Friedner D. Wittman, Ph.D. & Douglas Polcin, Ed.D., *The Evolution of Peer Run Sober*

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

- 3 -

*Housing as a Recovery Resource for California Communities*, 8 Int. J. Self Help Self Care, vol. 2, 157-187 (2014), doi:10.2190/SH.8.2.c, *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC4248351/ (*Evolution"*).

    e.    Attached hereto as Exhibit 6 is a true and correct copy of a paper titled Douglas Polcin, Ed.D.; Amy Mericle, Ph.D.; Jason Howell, M.B.A., P.R.S.; Dave Sheridan & Jeff Christensen, B.S., *Maximizing Social Model Principles in Residential Recovery Settings*, 46(5) J. Psychoactive Drugs 436, Nov. – Dec. 2014.

    10.    Sober living homes often follow what is known as "social model recovery" principles.  As discussed in Exhibit 6, *Maximizing Social Model Principles in Residential Recovery Settings ("Maximizing Social Model Principle")*, beginning in the 1940s, "[s]ocial model recovery emerged in California primarily as a grassroots movement that was built upon the principles of AA."  *Maximizing Social Model Principles* at 436 (citation omitted).  Studies have shown that social model recovery programs lead to favorable outcomes; in fact, "[p]rograms that self-identified as social model were shown to have similar or better outcomes than clinically oriented treatment programs that were typically more expensive."  *Id.*

    11.    The primary characteristics of social model recovery programs have been identified as:

- An emphasis on experiential knowledge gained through one's recovery experience.  Residents draw on that experience as a way to help others.

- Recovery operates via connections between residents, not between an individual resident and a professional caregiver.

- All residents are consumers and providers, both giving and receiving help.

- Involvement in AA creates the basic framework for recovery.

- A positive sober environment that encourages support for abstinence is crucial.

- Alcoholism is viewed as being centered in the reciprocal relationship between the individual and his or her surrounding social unit.

*Maximizing Social Model Principles* at 437 (citation omitted).

    12.    In 1998, Kaskutas and colleagues developed the 33 item Social Model Philosophy Scale (SMPS) both "to assess the extent to which programs used a social model approach to

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

recovery as well as what aspects of social model were used." *Id*.; *see* Kaskutas, L.A.; Greenfield, T.K.; Borkman, T.J. & Room, J., *Measuring treatment philosophy: A scale for substance abuse recovery programs*, Journal of Substance Abuse Treatment 15: 27-36 (1998) ("*Measuring treatment philosophy*"). The SMPS assesses the following six program domains:

- Physical environment: the extent to which the program facility offers a homelike environment;

- Staff role: the extent to which staff are seen as recovering peers;

- Authority base: the extent to which experiential knowledge about recovery is valued;

- View of substance abuse problems: the extent to which residents view substance abuse as a disease and are involved in 12-step groups;

- Governance: the extent to which the program empowers residents in decision making; and

- Community orientation: the extent to which the program interacts with the surrounding community in a mutually beneficial manner.

*Maximizing Social Model Principles* at 437 (citing *Measuring treatment philosophy, at* 15: 27-36). Recovery residences following a social model may fully or partially adopt all of the principles reflected in these six domains.

13. Recovery residences may follow various models. The National Alliance of Recovery Residences (NARR), a national standards setting body, has identified four increasingly more structured levels of recovery residences.

- Level I residences are peer-managed and operated homes in residential neighborhoods without paid staff members or on-site services. Residents may but not required to participate in 12-step recovery groups.

- Level II residences are managed by a house manager or senior resident who may be paid or receive a rent reduction. They do not offer treatment or other services on-site and residents are either required or strongly encouraged to attend 12-step recovery groups. Sober living homes are often Level II residences.

- Level III residences "employ paid staff who provide on-site services, such as linkage to resources in the community, recovery wellness planning, recovery support groups, and life skills training. In California, these residences are required to be licensed as treatment programs."

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

- Level IV residences are structured residential treatment programs that provide a variety of on-site clinical services by licensed or credentialed professionals, who may themselves be in recovery.

*Maximizing Social Model Principles* at 438.

14.     Regardless of its NARR Level, there are certain principles that apply to recovery residences generally, which facilitate implementation of the social model of recovery. These include developing and fostering a social model of recovery which emphasizes placing the individual's addiction and sobriety in a larger social context and mobilizing peer support. *See Maximizing Social Model Principles* at 438-39. Effective recovery residences also develop and implement rules and expectations that support personal growth, responsibility, and recovery, which are adopted and internalized by the residents. Among other things, household members are encouraged to understand that recovery involves more than just sobriety, but includes being a contributing member of the household and the community. *See id*. at 439. That is, "[d]oing one's fair share in terms of contributing to the household as a recovery environment and recognizing how one's behavior affects that environment is a key tenet across all social model programs." *Id*. at 439. Recovery residences also rely on house meetings to permit residents to share experiences and address issues. The meetings may be more or less structured, depending on the NARR Level of the residence. However, they all involve some degree of guidance and facilitation, either by more experienced residents (at a Level I or II residence) or by staff (at a Level III or IV facility). *See id*. at 439-40. Finally, all recovery residences have rules and policies designed to reinforce recovery, which may implement 12 step or similar recovery principles. Even in more structured Level III and IV homes, residents may have an opportunity to contribute to the development of rules and policies. *See id*. at 440.

15.     In a Level I or II home, in which residents have greater autonomy, the social model of recovery assists residents to learn to take responsibility for dealing with important and difficult issues involving admissions, involuntary evictions, relapses, conflicts between residents, and resident crises. *See Maximizing Social Model Principles* at 440-41. With respect to the inevitable conflicts between housemates, "[n]ewer residents and those in early recovery can benefit from senior residents with longer recovery sharing examples of how they worked the

- 6 -

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

steps[1] and applied other recovery principles to similar situations. This might involve consideration of recovery concepts such as taking an inventory and owning one's part in the conflict, making amends, and accepting powerlessness over other people and situations." *Id.* at 441. In a Level I or II residence, such as a sober living home, the residents may implement these conflict resolution principles, perhaps facilitated by a more senior resident or house manager.

16.      The social model principles discussed briefly above, as incorporated into the operations of sober living homes, have been found to be highly effective at promoting long term sobriety, including after the individual has left the sober living home. *See What Did We Learn* at 6 ("residents reduced or stopped their substance use between baseline [within a week of entering the sober living home] and 6 month follow up and then maintained those improvements at 12 and 18 months.") Significantly, in the two programs analyzed in our longitudinal study of sober living homes or SLHs, we found that "residents were able to maintain improvements even after they left the SLHs. At 12 months 68% had left ORS and 82% had left CSLT. By 18 months nearly all had left, yet improvements were for the most part maintained." *Id.* at 7.[2]

17.      In my research, each of the sober living homes that I have observed has had one or more residents who served in a voluntary role as a "house manager." These individuals have been sober for a period of time and have demonstrated a willingness and ability to assist other residents in their recovery by modeling healthy and positive behaviors for the newer residents. House managers share their strength, experience, and hope with their community.

18.      In each of the sober living homes with which I am familiar, the house managers are volunteers. The house managers generally receive a reduction in the fees charged by the

---

[1] "Working the steps" is a term used in 12 step recovery programs such as AA and refers to applying the appropriate "step" or principle in responding to a situation.

[2] This particular study was designed to assess outcomes for 300 individuals who entered two different models of sober living homes: Options Recovery Services (ORS) in Berkeley, California, which is associated with an outpatient treatment program; and Clean and Sober Transitional Living (CSTL) in Sacramento County, California, a group of 16 freestanding homes whish was not associated with any treatment facility. *See id.* at 3.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

operator of the sober living home.  In some instances, however, they may receive a stipend in lieu of a fee reduction.

19.     My research studies have included interviews with numerous residents of sober living homes, including residents who served as house managers.   These interviews have highlighted the importance of giving and receiving peer support and practical help as a way to maintain motivation for sobriety among all residents in the household.

20.     The role of the house manager in a sober living home is similar to that of a sponsor in Alcoholics Anonymous ("AA").  Sponsors are recovering alcoholics who take on a mentorship and support role with others who typically have less time in recovery.  Sponsors model healthy behavior and sobriety.

21.     Research has shown that being a sponsor in AA generally leads to positive outcomes for the sponsor and the individual who is being sponsored.  I am familiar with the work of Lee Ann Kaskutas, Dr.PH. and Sara Zemore, Ph.D.who have conducted research into the role of helping behaviors among persons involved in AA.  Her research has shown that helping behaviors lead to positive outcomes for recovering alcoholics.  Such positive outcomes include maintaining sobriety for an extended period.

22.     Other researchers have similarly discovered that one predictor of long term sobriety for recovering alcoholics is to assist others in recovery to maintain their own sobriety. This has been found to be true of individuals participating in AA.

    a.     Attached hereto as Exhibit 7 is a true and correct copy of a paper titled Maria E. Pagano, Ph.D., Karen B. Friend, Ph.D., J. Scott Tonigan, Ph.D., and. Robert L. Stout, Ph.D., *Helping Other Alcoholics in Alcoholics Anonymous and Drinking Outcomes: Findings from Project MATCH*, 65(6) J. Stud. Alcohol 65(6): 766-73 (November 2004), author manuscript, *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3008319/pdf/nihms253314.pdf ("*Helping Other Alcoholics*").

    b.     Attached hereto as Exhibit 8 is a true and correct copy of a paper titled Byron L. Crape, Carl A. Latkin, Alexandra S. Laris, Amy R. Knowlton, *The effects of sponsorship in*

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

- 8 -

12-step treatment of injection drug users, 65 Drug and Alcohol Dependence 291-301 (2002) ("Effects of Sponsorship").

c. Attached hereto as Exhibit 9 is a true and correct copy of a paper titled Sarah E. Zemore and Lee Ann Kaskutas, 12-Step Involvement and Peer Helping in Day Hospital and Residential Programs, 43 Substance Use & Misuse, 1882-1903 (2008) ("12-Step Involvement").

d. Attached hereto as Exhibit 10 is a true and correct copy of a paper titled Sarah E. Zemore, Lee Ann Kaskutas & Lyndsay N. Ammon, In 12-step groups, helping helps the helper, 99 Addiction 1015-23 (2004) ("Helping Helps").

23.    Helping behaviors have been found to assist individuals in recovery to maintain their sobriety.  For example, Pagano, et al., have found "compelling evidence that recovering alcoholics who help other alcoholics maintain long-term sobriety following formal treatment are themselves better able to maintain their own sobriety."  Helping Other Alcoholics at 1; see also Effects of Sponsorship at 296-97 (with respect to injection drug users "[b]eing a sponsor was strongly associated with not currently using at baseline as well as with abstinence.  The odds were nearly 7 times greater that a member of the Sponsors group reported not using illicit drugs at baseline when compared to the other study participants, . . . The odds were more than 3 times greater that a member of the Sponsors group maintained abstinence over 1 year than that of the other participants," after adjusting for certain variables); 12-Step Involvement at 1896 ("we also found that greater peer helping during treatment predicted higher odds of total abstinence across follow-ups — but only indirectly, by way of a positive association with 12-step involvement at 6 months (itself a strong predictor of sobriety).").

24.    A "continuing theme throughout AA principles is the critical importance of recovering alcoholics shifting their focus from self to others."  Helping Other Alcoholics at 2-3 (citations omitted).  Such helping behaviors may include, but are not limited to, serving as a sponsor.  Positive outcomes for those who helped other recovering alcoholics are significant.  "Among those who were helping other alcoholics, 40% of participants avoided taking a drink in the year after treatment, whereas, among those who were not helping other alcoholics, only 22%

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

avoided taking a drink." *Id*. at 6; *see also Effects of Sponsorship* at 297 ("Recent research has confirmed that, in the context of mutual-aid group, giving help is a predictor of improved psychosocial adjustment and receiving help that supports cognitive reframing was associated with improved social adjustment.") (citation omitted).  Further, "[t]hese attributes are believed to improve feelings of self-value and social usefulness, to provide models of successful behaviors and public commitment to behavior change, and to improve relationships and strengthen new social networks. The role of sponsor is also valued in the community and, to maintain this role, sponsors may be further motivated to continue their own abstinence." *Id*.

25.    In my research I have observed that where residents of sober living homes serve as house managers, this "helping behavior" is highly beneficial to the house managers' continued sobriety and recovery, and that it is also beneficial to the community of residents in the sober living home.

26.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this   5th    day of   August   , 2016, at   Concord                          , California.

_____
Douglas Polcin, Ed.D.

Ropers Majeski Kohn & Bentley
A Professional Corporation
Redwood City

# EXHIBIT 1

# Douglas L. Polcin, Ed.D., MFT

4383 Fallbrook Road
Concord, CA 94521
(925) 689-8847
E-Mail: DLPolcin@aol.com

## Education

University of California, Berkeley, School of Public Health
 Berkeley, CA
 Postdoctoral Fellow: Health Services and Public Health Research
 1996 - 1999

Northeastern University
 Boston-Bouve' College of Human Development
 Boston, MA
 Ed.D. Counseling Psychology: Leadership
 1991

San Francisco State University
 San Francisco, CA
 M.S. Clinical Psychology
 1982

Grand Valley State Colleges, Thomas Jefferson College
 Allendale, MI
 B.Ph. Psychology
 1979

## Research and Teaching Experience

Scientist and Senior Scientist, Public Health Institute
Oakland, CA
2005 to present
Principal Investigator and Co-investigator on National Institutes of Health studies.

Instructor, Pacific Graduate School of Psychology
Continuing Education
Palo Alto, CA
2006 to 2009
15-hour CEU Chemical Dependency Treatment Course.

Instructor, John F. Kennedy University, Departments of Counseling Psychology and
Continuing Education
Pleasant Hill, CA
2003 to 2008
Graduate Course on Constructive Confrontation in Addiction Treatment and 15-hour
CEU Chemical Dependency Treatment course.

Douglas L. Polcin, Ed.D., MFT

Instructor, University of California, Berkeley - Extension, Program in Alcohol and Drug Abuse Studies
Berkeley, CA
1993 to 2006
Field Experience in Chemical Dependency, Adolescent Substance Abuse, and Motivational Interviewing courses.

Research Psychologist, Haight Ashbury Free Clinics
San Francisco, CA
1999 to 2005
Principal Investigator and co-investigator for alcohol and drug abuse studies.

Program Evaluator, Ohlhoff Recovery Programs
San Francisco, CA
1999 to 2005
Longitudinal evaluation of treatment outcomes in residential programs.

Instructor, California Institute of Integral Studies, Department of Counseling Psychology
San Francisco, CA
2001 to 2004
Graduate course in Family and Couples Therapy.

Instructor, Dominican University of California, Department of Counseling Psychology
San Rafael, CA
1998 to 2004
Graduate Courses in Addictions and Family and Couples Therapy.

Postdoctoral Fellow, University of California, Berkeley, School of Public Health
Berkeley, CA
1996 to 1999
Published review articles on alcohol problems and health services research; published research on the "Role of Coercion in Treatment Entry in Public, Private and HMO Alcohol Treatment Programs;" presented two posters at Research Society on Alcohol Annual conferences; completed extensive training in statistical analysis, research methods, and SPSS statistical software.

Instructor, Chapman University, Department of Psychology
Travis, CA
1995 to 1999
Advanced Individual Counseling, Group Counseling, Family Therapy, Substance Abuse, and Abnormal Behavior graduate and undergraduate courses.

Instructor, California School of Professional Psychology, Continuing Education
Alameda, CA
1996 to 1997
Substance Abuse Assessment and Treatment courses for licensed psychologists and clinical social workers.

Douglas L. Polcin, Ed.D., MFT

**Administrative and Clinical Experience**

Private Psychotherapy Practice
Fairfield, CA and Oakland, CA
1989 to 1999
Individual, couple, and family therapy; anger management groups; specialty areas included domestic violence, substance abuse, and a broad array of personal and relationship problems.

Mental Health Clinician, Berkeley Mental Health Court Program
Berkeley, CA
1996 to 1998
Mental health assessments of defendants at the Berkeley City Jail, recommendations to the court regarding case dispositions, intake evaluations, team treatment planning, individual therapy, group therapy, and supervision of doctoral students in a program serving a wide variety of client diagnostic groups and presenting issues.

Cognitive-Behavioral Therapist, Haight-Ashbury Alcohol Treatment Services
San Francisco, CA
1993 to 1994
Time limited individual therapy with alcohol abusing clients using a structured, cognitive behavioral manual as part of a random clinical trial studying a medication for alcohol treatment.

Clinical Treatment Counselor, Battered Women's Alternatives, Men's Program
Concord, CA
1989 to 1992
Intake assessments, individual therapy, and group therapy with men who had domestic violence problems.

Youth Services Coordinator, San Leandro Community Counseling
San Leandro, CA
1991 to 1992
Coordination and supervision of substance abuse prevention programs for adolescents in public schools and juvenile detention facilities.

Program Supervisor, Thunder Road Adolescent Treatment Centers
Oakland, CA
1989 to 1991
Program planning and development, hiring and supervision of staff, coordination of Group Home services with other departments and community agencies, co-facilitation of individual, group and multifamily group treatment with counselors in a residential chemical dependency program for adolescents.

Douglas L. Polcin, Ed.D., MFT

Staff Psychologist, Fresh Pond Day Treatment, Cambridge Hospital
Department of Psychiatry, Harvard Medical School
Cambridge, MA
1987 to 1989
 Intake assessments, individual case coordination, team treatment planning, verbal and
task oriented groups, recreational activities, family therapy, and supervision of master's
level psychology interns in an adult psychiatric day treatment program.

Program Director, Garland House, The Psychological Center
Lawrence, MA
1985 to 1987
Program planning and development, hiring and supervision of staff, management of
program budget, coordination of treatment and programming with various clinical and
administration professionals in a psychiatric halfway house serving young adults with
chronic mental illness.

Mental Health Therapist, Central City Day Treatment, San Francisco General Hospital,
Department of Psychiatry, UCSF
San Francisco, CA
1982 to 1984
Intake assessments, individual therapy, case coordination, team treatment planning,
verbal and task oriented groups, recreational therapy, in-service presentations,
supervision of junior counselors, and member of a program evaluation and research
committee in a rehabilitative psychiatric day treatment program.

Counselor, Serenity Inc., Adult Residential Treatment Program
Redwood City, CA 1979 to 1980
Intake assessments, phase evaluations, team treatment planning, individual counseling,
and group counseling in an adult therapeutic community drug treatment program.

## INTERNSHIPS

Intern/Drug Treatment Specialist, North Charles Institute for the Addictions
Cambridge Hospital Department of Psychiatry, Harvard Medical School
Cambridge, MA
1884 to 1985
Intake assessments, individual therapy, group therapy, development and
implementation of a group skill-training program in a heroin addiction treatment
program.

Intern, San Francisco State University, Psychological Services, Student Health Center
San Francisco, CA
1981 to 1982
Intake assessments, brief individual therapy, and group therapy with college students
presenting a variety of problems and diagnoses.

Douglas L. Polcin, Ed.D., MFT

Intern, Berkeley Mental Health Day Treatment Program
Berkeley, CA
1980 to 1981
Intake assessments, team treatment planning, individual therapy, case management, and group treatment in an adult psychiatric day treatment program.

## License and Certification

California Marriage and Family Therapist License (# MFC22415), Acquired 1986.

California Community Colleges Counselor Credential (# 14099), Acquired 1985.

California Community Colleges Instructor Credential, Subject Matter Area:  Psychology (#05154), Acquired 1983.

## Honors

Kappa Delta Pi Honor Society

## Professional Membership

College on Problems of Drug Dependence

American Public Health Association

Research Society on Alcoholism

## Grant Review Committees

Temporary Member, AIDS-Science Track Award for Research Transition (2014).

Full Member, National Institute of Health (NIH) Center for Scientific Review Grant Review Committee, Behavioral and Social Interventions for the Prevention of HIV (BSPH), 2006 to 2013.

Temporary Member, National Institute of Health (NIH) Center for Scientific Review Grant Review Committee, Behavioral and Social Consequences of HIV, (BSCH) 2009.

Temporary Member, Small Business Innovative Research (SBIR) 2009.

Temporary Member, Center for Disease Control and Prevention, Environmental Health/ATSDR and Injury Prevention, 2008.

## Editorial Board Appointments

Member of the Editorial Board, *Journal of Addiction and Offender Counseling*, 1996 to 2002.

5

Douglas L. Polcin, Ed.D., MFT

Member of the Editorial Board, *Journal of Counseling and Development*, 2003 to 2006.

Member of the Editorial Board, *Journal of Psychoactive Drugs,* 2012 to present.

**Ad Hoc Reviewer**

*International Journal of Drug Policy*, *Addiction*, *Drug and Alcohol Dependence, Journal of Psychoactive Drugs, Addictive Behaviors, Continuum: Developments in Ambulatory Mental Health Care, Addiction Research & Theory, Community Mental Health Journal, Psychological Services, Substance Abuse*

**Peer Reviewed Publications** (Chronologically Ordered)

Polcin, D.L. (1990).  Administrative planning in community mental health. *Community Mental Health Journal, 26*(2), 181-192.

Polcin, D.L. (1990).  Ethical issues in the deinstitutionalization of clients with mental disorders.  *Journal of Mental Health Counseling, 12*(4), 446-457.

Polcin, D.L. (1991).  Prescriptive group leadership.  *Journal for Specialists in Group Work, 16*(1), 8-15.

Polcin, D.L. (1992). A comprehensive model for adolescent chemical dependency treatment.  *Journal of Counseling and Development. 70*(3), 376-382.

Polcin, D.L. (1992). Issues in the treatment of dual diagnosis clients with chronic mental illness. *Professional Psychology:  Research and Practice, 23*(1), 30-37.

Polcin, D.L. (1995). Clinical perceptions about dual diagnosis clients in psychiatric day treatment. *Continuum:  Developments in Ambulatory Mental Health Care, 2(*4), 91-308.

Polcin, D.L. & Guterman, T. (1996).  Working with deinstitutionalized patients in milieu  treatment:  Issues for novice therapists. *Continuum:  Developments in Ambulatory Mental Health Care, 3*(2), 111-124.

Polcin, D.L. (1997).  The etiology and diagnosis of alcohol dependence: Differences In the professional literature. *Psychotherapy, 34*(3), 297-306.

Polcin, D.L. (1999).  Criminal justice coercion in the treatment of alcohol problems: An examination of two client subgroups. *Journal of Psychoactive Drugs, 31*(2), 137-143.

Polcin, D.L. & Weisner, C. (1999).  Factors associated with coercion in entering treatment for alcohol problems.  *Drug and Alcohol Dependence, 54*, 63-68.

Polcin, D.L. (2000).  Professional therapy versus specialized programs for alcohol and drug abuse treatment. *Journal of Addiction and Offender Counseling, 21*(1), 2-11.

Douglas L. Polcin, Ed.D., MFT

Polcin, D.L. 2000). Coercive treatment for misdemeanor clients with substance use disorders. *Journal of the California Association of Counseling and Development, 20,* 15-20.

Polcin, D.L. (2001). Sober living houses: Potential roles in substance abuse services and suggestions for research. *Substance Use and Misuse, 36*(2), 301-311.

Polcin, D.L. (2001). Drug and alcohol offenders coerced into treatment: A review of modalities and suggestions for research on social model programs. *Substance Use and Misuse, 36*(5), 589-608.

Ball, S., Bachrach, K., DeCarlo, J., Farentinos, C., Keen, M. McGrail, M., McSherry, T., Polcin, D., Snead, N., Sockriter, R., Wrigley, P., Zammarelli, L., & Carroll, K. (2002). Characteristics of community clinicians volunteering to learn and provide manual-guided therapies for substance abusers. *Journal of Substance Abuse Treatment, 23,* 309-318.

Carroll, K.M., Farentinos, C., Ball, S.A., Crits-Christoph, P. Libby, B., Morgenstern, J. Obert, J.L., Polcin, D.L., & Woody, G.E. (2002). MET meets the real world: Design issues and clinical strategies in the Clinical Trials Network. *Journal of Substance Abuse Treatment,* 23(2) 73-80.

Polcin, D.L., Prindle, S. & Bostrom, A. (2002). Integrating social model principles into broad based treatment: Results of a program evaluation. *American Journal of Drug and Alcohol Abuse, 28*, 585-599.

Polcin, D.L. (2003). Rethinking confrontation in alcohol and drug treatment: Consideration of the clinical context. *Substance Use and Misuse, 38*, 165-184.

Polcin, D.L. & Greenfield, T.K. (2003). Factors associated with probation officers' use of criminal justice coercion to mandate alcohol treatment. *American Journal of Drug and Alcohol Abuse, 29*(3), 647-670.

Polcin, D.L. (2004). Bridging Psychosocial Research and Treatment in Community Substance Abuse Programs. *Addiction Research and Theory, 12*(3), 275-284.

Polcin, D.L. (2004). Probation officers' beliefs about the effectiveness of alcohol treatment. *Journal of Psychoactive Drugs*, 36(2), 279-283.

Polcin, D.L. & Zemore, S. (2004). Psychiatric severity and spirituality, helping and Participation in alcoholics anonymous during recovery. *American Journal of Drug and Alcohol Abuse, 30*(3), 577-592.

Polcin, D.L., Galloway, G.P., Palmer, J. & Mains, W. (2004). The case for high-dose Motivational Enhancement Therapy. *Substance Use and Misuse, 39*(2), 331-343.

Polcin, D.L. (2006). How health services research can help clinical trials become more community relevant. *International Journal of Drug Policy, 17*, 230-237.

Douglas L. Polcin, Ed.D., MFT

Polcin, D.L. (2006). What about sober living houses for parolees? *Criminal Justice Studies: A Critical Journal of Crime, Law and Society, 19*(3), 291-300.

Polcin, D.L. (2006). Reexamining confrontation and motivational interviewing. *Addictive Disorders and their Treatment, 5*(4), 201-209.

Polcin, D.L., Galloway, G.P. & Greenfield, T.K. (2006). Measuring confrontation during recovery from addiction. *Substance Use and Misuse, 41*, 369-392.

Polcin, D.L. & Greenfield T.K. (2006). Confrontation about potential harm related to substance use: Changes in and correlates of confrontation in sober living houses. *Therapeutic Communities, 27*(3), 373-386.

Carroll, K., Farentinos, C., Ball, S.A., Crits-Christoph, P. Libby, B., Morgenstern, J. Obert, J.L., Polcin, D.L., & Woody, G.E. (2006). Motivational interviewing to improve treatment engagement and outcome in individuals seeking treatment for substance abuse: A multisite effectiveness study. *Drug and Alcohol Dependence, 81*(3), 301-312.

Polcin, D.L & Beattie, M. (2007). Relationship and institutional pressure to enter treatment: Differences by demographics, problem severity and motivation. *Journal of Studies on Alcohol and Drugs, 68*(3), 428-436.

Polcin, D.L., Galloway, G., Bostrom, A. & Greenfield, T.K. (2007). Factor analysis of the Alcohol and Drug Confrontation Scale (ADCS). *Addictive Behaviors, 32*, 2274-2280.

Polcin, D.L. (2007). Reflections on lost opportunities at the Haight Ashbury Free Clinic: Lessons for progressive non-profit organizations. *Journal for Social Action in Counseling and Psychology*, 1(1), 29-39.

Kaskutas, L.A., Ammon, L.N., Oberste, E. & Polcin, D.L. (2007). A brief scale for measuring helping activities in recovery: The Brief Helper Therapy Scale. *Substance Use and Misuse, 42*(11), 1767 – 1781.

Galloway, G.P., Polcin, D.L., Kielstein, A., Brown, M. & Mendelson,J. (2007). High dose motivational enhancement therapy for methamphetamine dependence. *Journal of Psychoactive Drugs, SARC Supplement 4*, 393-400.

Polcin, D.L. & Henderson, D. (2008). A clean and sober place to live: Philosophy, structure, and purported therapeutic factors in sober living houses. *Journal of Psychoactive Drugs*, 40(2), 153-159.

Polcin, D. L., Nayak, M. B., & Blacksher, S. (2008). Addressing trauma among women with serious addictive disorders: Treatment models, program factors, and potential mediators. *Journal of Drug Addiction, Education, and Eradication*, 4(3-4), 221.

Polcin, D.L. (2009). Communal living settings for adults recovering from substance abuse. *Journal of Groups in Addiction and Recovery, 4,* 7-22.

Douglas L. Polcin, Ed.D., MFT

Polcin, D.L. (2009). A model for sober housing during outpatient treatment. *Journal of Psychoactive Drugs*, *41*(2), 153–161.

Polcin, D.L., Galloway, G.P., Bond, J., Korcha, R. & Greenfield, T.K. (2009). Confirmatory factor analysis and test-retest reliability of the Alcohol and Drug Confrontation Scale (ADCS). *Journal of Drug Issues, 39*, 931-948.

Polcin, D.L., Korcha, R., Bond, J. & Galloway, G.P. (2010). Sober living houses for alcohol and drug dependence: 18-Month outcomes. *Journal of Substance Abuse Treatment, 38*(4), 356-365.

Polcin, D.L., Korcha, R., Bond, J., Galloway, G.P. & Lapp, W. (2010). Recovery from addiction in two types of sober living houses: 12-month outcomes. *Addiction Research and Theory, 18*, 442-455.

Polcin, D.L., Galloway, G.P., Bond, J., Korcha, R. & Greenfield, T.K. (2010). How do residents of recovery houses experience confrontation between entry and 12-month follow-up? *Journal of Psychoactive Drugs, 42*, 49-62.

Polcin, D.L., Korcha, R., Bond, J. & Galloway (2010). Eighteen month outcomes for clients receiving combined outpatient treatment and sober living houses. *Journal of Substance Use*, *15,* 352-366.

Polcin, D.L., Korcha, R., Bond, J. & Galloway, G.P. (2010). What did we learn from our study on sober living houses and where do we go from here? *Journal of Psychoactive Drugs, 42*, 425-33.

Korcha, R. A., Polcin, D. L., Bond, J., Lapp, W. M., & Galloway, G. (2011). Substance use and motivation: A longitudinal perspective. *The American Journal of Drug and Alcohol Abuse, 37,* 48-53.

Polcin, D. L., Korcha, R., Greenfield, T. K., Bond, J., & Kerr, W. (2012). Twenty-one-year trends and correlates of pressure to change drinking. *Alcoholism: Clinical and Experimental Research, 36(4)*, 705-715.

Polcin, D. L., Buscemi, R., Nayak, M., Korcha, R., & Galloway, G. (2012). Gender differences in psychiatric symptoms among methamphetamine dependent residents in sober living houses. *Addictive disorders & their treatment*, *11*(2), 53-63.

Polcin, D. L., Henderson, D. M., Korcha, R., Evans, K., Wittman, F., & Trocki, K. (2012). Perceptions of sober living houses among addiction counselors and mental health therapists: Knowledge, views and perceived barriers. *Journal of psychoactive drugs*, *44*(3), 224-236.

Polcin, D. L., Henderson, D., Trocki, K., Evans, K., & Wittman, F. (2012). Community context of sober living houses. *Addiction Research & Theory*, 20(6), 480-491.

Douglas L. Polcin, Ed.D., MFT

Polcin, D. L., Mulia, N., & Jones, L. (2012). Substance users' perspectives on helpful and unhelpful confrontation: Implications for recovery. *Journal of psychoactive drugs*, *44*(2), 144-152.

Polcin, D.L., Korcha, R., Greenfield, T.K., Bond, J. & Kerr, W. (2012). Pressure to reduce drinking and reasons for seeking treatment. *Contemporary Drug Problems, 39(4),* 705-732.

Korcha, R., Polcin, D.L., Kerr, W.C., Greenfield, T.K, & Bond, J. (2012).  Pressure and help seeking for alcohol problems. Trends and correlates from 1984 to 2005. *Addictive Behaviors*, 38(3), 1740–1746.

Korcha, R. A., & Polcin, D. L. (2012). Addressing the deluge of early release prisoners into US communities [Editorial]. *Addiction*, *107*(1), 4-5.

Jason, L.A., Mericle, A.A., Polcin, D.L., & White, W.L. (2013). The role of recovery residences in promoting long-term addiction recovery. *American Journal of Community Psychology,* 52, 406-411.

Korcha, R.A., Polcin, D.L., Evans, K., Bond, J. & Galloway, G.P. (2013). Intensive Motivational Interviewing for women with concurrent alcohol problems and methamphetamine dependence.  *Journal of Substance Abuse Treatment***.**  DOI: 10.1016/j.jsat.2013.08.013.

Keoleian, V., Stalcup, S. A., Polcin, D. L., Brown, M., & Galloway, G. (2013). A cognitive behavioral therapy-based text messaging intervention for methamphetamine dependence. *Journal of Psychoactive Drugs*, *45*(5), 434-442.

Polcin, D. L. (2014). Addiction science advocacy: Mobilizing political support to influence public policy. *International Journal of Drug Policy*, *25*(2), 329-331.

Korcha, R. A., Polcin, D. L., Evans, K., Bond, J. C., & Galloway, G. P. (2014). Intensive motivational interviewing for women with concurrent alcohol problems and methamphetamine dependence. *Journal of Substance Abuse Treatment, 46*(2), 113-119.

Korcha, R. A., Polcin, D. L., Greenfield, T. K., Kerr, W. C., & Bond, J. (2014). Pressure to change drinking behavior: an exploratory analysis of U.S. general population subgroups. *Journal of Drug Issues, 44*(4), 457-465.

Polcin, D. L., Bond, J., Korcha, R., Nayak, M. B., Galloway, G. P., & Evans, K. (2014). Randomized trial of Intensive Motivational Interviewing for methamphetamine dependence. *Journal of Addictive Diseases*, 33, (3), 253-265

Polcin, D. L., Korcha, R., & Bond, J. (2014). Interaction of motivation and psychiatric symptoms on substance abuse outcomes in sober living houses.  *Substance Use and Misuse,* doi:10.3109/10826084.2014.962055.

Douglas L. Polcin, Ed.D., MFT

Wittman, F. D., & Polcin, D. L. (2014). The evolution of peer run sober housing as a recovery resource for California communities. *International Journal of Self Help and Self Care*, *8*(2), 157-187.

Wittman, F. D., Jee, B., Polcin, D. L., & Henderson, D. (2014). The setting is the service: How the architecture of sober living residences supports community-based recovery. *International Journal of Self Help and Self Care*, *8*(2), 189-225.

Polcin, D. L. (2014). Introduction to the special issue: Architecture enhances mutual aid in sober living houses. *International Journal of Self Help and Self Care*, *8*(2), 153-156.

Polcin, D., Mericle, A., Howell, J., Sheridan, D., & Christensen, J. (2014). Maximizing social model principles in residential recovery settings. *Journal of Psychoactive Drugs*, *46*(5), 436-443.

Polcin, D. (2015).  How should we study residential recovery homes? *Therapeutic Communities: The International Journal of Therapeutic Communities,* 36(3), 163-172.

Polcin, D.L. (2015). Co-occurring substance abuse and mental health problems among homeless persons: Suggestions for research and practice. *Journal of Social Distress and the Homeless*, 1-10.

Polcin, D. L., Korcha, R., Bond, J., Galloway, G., & Nayak, M. (2015). Changes in psychiatric symptoms among persons with methamphetamine dependence predicts changes in severity of drug problems but not frequency of use. *Substance Abuse*. DOI:10.1080/08897077.2015.1015701.

Polcin, D. L., Korcha, R. A., & Bond, J. C. (2015). Interaction of motivation and psychiatric symptoms on substance abuse outcomes in sober living houses. *Substance Use & Misuse*, *50*(2), 195-204.

Polcin, D. L., & Korcha, R. (2015). Motivation to maintain sobriety among residents of sober living recovery homes. *Substance Abuse and Rehabilitation*, *6*, 103.

Polcin, D. L., Sterling, J., Brown, T., Brown, M., Buscemi, R., & Korcha, R. (2015). Client and therapist views about intensive and standard motivational interviewing. *Journal of Contemporary Psychotherapy*, *45*(3), 167-176.

Keoleian, V., Polcin, D., & Galloway, G. P. (2015). Text messaging for addiction: A review. *Journal of Psychoactive Drugs*, *47*(2), 158-176.

Polcin, D. L., Mericle, A. A., Callahan, S., Harvey, R., & Jason, L. A. (2016). Challenges and rewards of conducting research on recovery residences for alcohol and drug disorders. *Journal of Drug Issues*, *46*(1), 51-63.

Douglas L. Polcin, Ed.D., MFT

Polcin, D.L., Korcha, R. & Bond, J. (2016). Interaction of motivation and social support on abstinence among recovery home residents. *Journal of Drug Issues*. doi: 10.1177/0022042616629514.

Polcin, D., Korcha, R., Gupta, S., Subbaraman, M. S., & Mericle, A. A. (in press). Prevalence and trajectories of psychiatric symptoms among sober living house residents. *Journal of Dual Diagnosis*.

Polcin, D., Witbrodt, J. Korcha, R., Gupta, S., & Mericle, A. A. (in press). Course of psychiatric symptoms and abstinence among methamphetamine dependent persons in sober living recovery homes. *Journal of Psychoactive Drugs*.

**Other Publications** (Chronologically Ordered)

Polcin, D.L. (1982). *The psychodynamic treatment of schizophrenia: A developmental perspective.* Unpublished master's thesis, San Francisco State University.

Polcin, D.L. (1995). Review of "*When someone you love has a mental illness.*" *Community Mental Health Journal, 31*(3), 289.

Polcin, D.L. (1995). Integrating 12-step principles into therapy with substance abusers: An examination of controversial issues. *The California Therapist, 7*(6), 56-58.

Polcin, D.L. (1997). Combining cognitive behavioral and 12-step approaches in the treatment of alcohol dependence. *The California Therapist, 9*(2), 47-51.

Polcin, D.L. (2000). How to manage manger care. *Professional Counselor: The Magazine for Addiction Professionals, 15,* 37-49.

Polcin, D.L. (2000). What are we learning from research on alcohol and drug abuse treatment? *The California Therapist, 12*(1), 48-53.

Polcin, D.L. (2002). What if they aren't ready? How to increase motivation for treatment. *Professional Counselor: The Magazine for Addiction Professionals, 3,* 34-37.

Polcin, D.L. (2002). Motivational Interviewing: A strategy for treating unmotivated clients with alcohol and drug problems. *The California Therapist, 14*(5), 67-70.

Galloway G.P. & Polcin D.L. (2003). Rehabilitation Programs. In *Alcoholism: A Practical Handbook,* Johnson B.A., Ruiz, P. & Galanter, M, eds. (pp.174-183). Lippincott Williams & Wilkins: Philadelphia, PA.

Polcin, D.L, Galloway, G.P., Taylor, K. & Benowitz-Fredericks, A. (2004). Where are they Going to Live Why we need    to study sober Living houses. *Counselor: The Magazine for Addiction Professionals, 5*(5), 36-45.

Polcin, D.L. & Greenfield, G.P. (2006). What do we mean by confrontation and does

Douglas L. Polcin, Ed.D., MFT

the social context matter? *Addiction*, 101(7), 1057.

Polcin, D.L. (2007). Confrontation as a form of social support and feedback. *Drugs and Alcohol Today, 7*(1), 11-15.

Polcin, D. L., Nayak, M. B., Blacksher, S. (2008). Addressing trauma among women with serious addictive disorders: treatment models, program factors, and potential mediators. *Journal of Drug Addiction, Education and Eradication*, 4(3/4), 221-237.

Polcin, D.L. & Borkman, T. (2008). The impact of AA on non-professional substance abuse recovery programs and sober living houses. In M. Galanter and L. Kaskutas (Editors), *Recent Developments in Alcoholism, Volume 18: Alcoholics Anonymous and Spirituality in Addiction Recovery* (pp. 91-108). New York: Kluwer Academic/Plenum Publisher.

Korcha, R. A., & Polcin, D. L. (2012). Addressing the deluge of early release prisoners into US communities. *Addiction, 107*(1), 4-5.

Korcha, R. A., Polcin, D. L., Evans, K., Bond, J. C., & Galloway, G. (in press). Intensive motivational Interviewing for women with concurrent alcohol problems and methamphetamine dependence. *Counselor: The Magazine for Addiction Professionals.*

**Presentations** (Chronologically Ordered)

Greenberg, P., Ekstedt, E.J., McGuinness, T.M., Polcin, D.L. & Wilson, J. (1984 June). Toward the development of scales and a research design to measure chronic patients' responsiveness to rehabilitative day treatment. Oral presentation to the *American Association for Partial Hospitalization Annual Conference*, San Francisco, California.

Polcin, D.L. & Weisner, C. (1998 January). Factors associated with coercion in entering treatment for alcohol problems. Poster presented at the *Eighth International Conference on treatment of Addictive Behaviors*, Santa Fe, New Mexico.

Polcin, D.L. & Weisner, C. (1998 June). Employment and occupation: Factors related to alcohol problems and treatment entry. Poster presented at the *Research Society on Alcoholism Annual Scientific Meeting*, Hilton Head Island, South Carolina.

Polcin, D.L. (2001 June). Probation officer's use of legal coercion to mandate entry into alcohol treatment. Oral Presentation presented at the *College on Problems of Drug Dependence Annual Scientific* Meeting, Scottsdale, Arizona.

Polcin, D.L., Greenfield, T.K & Taylor, K. (2002 June). Are family drinking problems among probation officers related to their views and practices? Poster presented at the *College on    Problems of Drug Dependence Annual Scientific* Meeting, Quebec City, Canada.

13

Douglas L. Polcin, Ed.D., MFT

Polcin, D.L., Kaskutas, L. & Zemore, S. (2003 June). Psychiatric Severity and Helping Behaviors in Recovery.  Poster presented at the *College on Problems of Drug Dependence Annual Scientific* Meeting, Bal Harbour, FL.

Polcin, D.L. & Galloway, G.P. (2005 June).  Measuring Confrontation and Its Perceived Effect during Recovery. Oral presentation delivered at the *Research Society on Alcoholism Annual Scientific Meeting,* Santa Barbara, CA.

Polcin, D.L., Galloway, G.P., Taylor, K., Lopez, D. & De Barraicua (2005 June).  The Ecology of Sober Living Houses:  Adapting to Recovery from Addiction.  Oral presentation delivered at the *Society for Community Research and Action*, University of Illinois, Champaign-Urbana.

Polcin, D.L. & Galloway, G. (2005, June). Measuring external pressure to change: The Alcohol and Drug Confrontation Scale. Poster presented at the *College on Problems f Drug Dependence*, Orlando, Florida.

Polcin, D. L. (2006 January). Where are clients going to live? Potential roles for sober living houses.  Oral presentation delivered at the *International Conference on the Treatment of Addictive Behaviors (ICTAB-11)*, Santa Fe, NM, January 29–February 2.

Polcin, D.L. (2006 June). What are "Sober Living Houses" and who benefits from them? Poster presented  at the *Research Society on Alcoholism*, Baltimore, MD.

Greenfield, T.K., Kaskutas, L.A., Polcin, D.L. & Schmidt, L. (2006 September). New services research from the Alcohol Research Group.  Chairperson and oral presentation at the *California Conference on Alcohol and Other Drug Prevention, Treatment, and Recovery*, Sacramento, CA.

Polcin, D.L. (2006 October). Sober Living Houses after, during, and as an Alternative to Treatment. Oral presentation delivered at the *Addiction Health Services Research (AHSR) Conference: Understanding the Community Perspective*, Little Rock, Arkansas.

Polcin, D.L. & Korcha, R. (2006 November). Sober Living Houses for Substance Use Disorders: Do Residents Receive the Services They Need? Poster presented at the *American Public Health Association 134th Annual Meeting and Exposition,* Boston, MA.

Polcin, D.L., Korcha, R. & Bond, J. (2007 July). Who Receives Confrontation in Recovery Houses and when is it Experienced as Supportive? Poster presented at the *Research society on Alcoholism*, Chicago, Illinois.

Polcin, D.L., (2007 August). *Creating the Environmental Context for Sustained Alcohol and Drug Recovery*.  (Symposium Chair).  American Psychological Association, San Francisco, CA.

Douglas L. Polcin, Ed.D., MFT

Polcin, D.L. (2008, June). A model for sober living houses during outpatient treatment and 6-month outcomes. Poster presented at the *Research Society on Alcoholism Annual Meeting*, Washington DC.

Polcin, D.L., Lapp, W., Korcha, R. & Galloway, G. (2008, November). Three models of residential recovery houses for addiction: One year outcomes. Oral presentation at the *American Public Health Association Annual Meeting & Exposition 137th Annual Meeting & Exposition*, Philadelphia, PA.

Galloway, G.P., Fiske, L., Siegrist, J., Baggott, M.P., Flower, K., Buscemi, R., Polcin, D., Mendelson, J. (2009, June). Dextroamphetamine as a treatment for ethamphetamine dependence, *College on Problems of Drug Dependence*, 71st Annual Meeting, Reno, Nevada.

Korcha, R. A., D. L. Polcin, et al. (2009, October). Sober Living Houses as a Viable Model for Continuing Care. *Addiction Health Services Research Conference*. San Francisco, CA.

Polcin, D.L. (2009, October) Keynote address: What are we learning from research on sober living houses, and where do we go from here? *The Southern California Recovery Summit. Loyola Marymount University Addiction Counseling Program*. Los Angeles, CA.

Mulia, N., Polcin, D.L. & Jones, L. (2009, November). Understanding the context of confrontation: Implications for recovery from substance abuse. Oral presentation at the *American Public Health Association Annual Meeting*. Philadelphia.

Korcha, R.A., Polcin, D.L., Bond, J., & Galloway, G. (2009, October). Sober living houses as a viable model for continuing care. Poster presented at the meeting of *Addiction Health Services Research,* San Francisco, CA.

Korcha, R. A., Polcin, D. L., Bond, J. C., & Galloway, G. P. (2010, June). Psychiatric distress and substance use outcomes among Sober Living residents, Poster presented at the *33rd Annual Research Society on Alcoholism (RSA) Scientific Meeting*. San Antonio, TX.

Korcha, R.A., Polcin, D.L., Nayak, M.N., Buscemi, R., Bond, J., & Galloway, G. (2010, July). Sober living houses as a recovery option for methamphetamine dependence. Poster presented at the *Translational Research on Methamphetamine Addiction, Pray, Montana.*

Polcin, D.L., Korcha, R., Wittman , F. & Troutman, D. (2010, October). Sober Living Houses for Offenders: Outcomes and Barriers. Paper presented at the *California Department of Alcohol and Drug Programs Training Conference 2010*. Sacramento, CA.

Polcin, D.L., Korcha, R., Bond, J. & Galloway, G.P. (2010, November). Sober Living Houses for Substance Abusing Offenders. Paper presented at the *138th. American*

15

Douglas L. Polcin, Ed.D., MFT

*Public Health Association Annual Meeting: Social Justice and Public Health*, Denver, Colorado.

Korcha, R., Polcin, D. L., Greenfield, T. K., & Kerr, W. C. (2012). Pressure to reduce drinking and reasons for seeking treatment *35th Annual Research Society on Alcoholism Scientific Meeting*. San Francisco, CA: June 26.

Korcha, R. A., Polcin, D. L., Kerr, W. C., Greenfield, T. K., & Bond, J. C. (2012). Pressure to change drinking over the course of 26 years: cohort effects from the National Alcohol Surveys *140th Annual Meeting and Exposition of the American Public Health Association*. San Francisco, CA: October 27-31.

Korcha, R. A., Polcin, D. L., Evans, K., & Galloway, G. (2012). Intensive Motivational Interviewing for methamphetamine dependence. *College on Problems of Drug Dependence*. Indian Wells, CA: June 9-14.

Polcin, D. L., Korcha, R. A., Wittman, F., Trocki, K., Henderson, D., & Evans, K. (2012). Sober Living: Outcomes and Community Context. *Advanced Alcohol Research Seminar. Alcohol Research Group,* Emeryville, CA: February 21.

Polcin, D. L., Korcha, R. A., Nayak, M., & Bond, J. (2014). Methamphetamine dependence and intensive motivational interviewing.  Poster presentation at the *College on Problems of Drug Dependence*. San Juan, Puerto Rico: June 14-19.

Polcin , D.L. (2014).  Maximizing social model recovery in residential settings. Presentation at the *Fourth Annual National Alliance for Recovery Residence Board & Affiliates Meeting*.  St. Paul, MN: June 6-8.

Polcin, D.L. (2014). What are we learning about California sober living houses?*Oxford House 16th Annual World Convention*.  Portland, Oregon: September 11-14.

Korcha, R. A., Polcin, D.L., Mericle, A. A. & Bond, K. (2014). Sober living houses: Research in northern and southern California. Presentation at the annual *Addiction Health Services Research* conference, Boston, MA: October 16-17.

Polcin, D.L. & Wittman, F.D. (2014). Sustaining long-term recovery in sober living houses: History, research and practice considerations. *California Consortium of Addiction Programs and Professionals Annual Conference*.  San Diego, CA: October 29 – November 2.

Polcin, D. L., Korcha, R. A., Nayak, M., & Bond, J. (2015). Methamphetamine dependence and intensive motivational interviewing. *Drug & Alcohol Dependence*, *146*, e72.

Korcha, R. A., Polcin, D. L., Mericle, A. A., & Bond, J. (2015). Sober living houses: research in northern and southern California. *Addiction science & clinical practice*, *10*(1), 1.

Douglas L. Polcin, Ed.D., MFT

Polcin, D. L., Nemoto, T., Korcha, R., Mericle, A., & Mahoney, E. (2015). Predictors of HIV risk among ex-offenders entering sober living recovery residences for drug problems. *Drug and Alcohol Dependence*, *156*, e179.

## Current Projects

### *Randomized Trial of Intensive MI to Improve Drinking Outcomes among Women*

This study is a randomized clinical trial of Intensive Motivational Interviewing (IMI) for 220 women with alcohol dependence. Outcomes between women assigned to IMI or a single session of MI will be compared at 2, 6, and 12 months. Outcomes include measures of drinking, alcohol problems, psychiatric symptoms, trauma, and other outcomes. Qualitative interviews will be conducted to assess women's experiences of the intervention and views about what was and was not helpful. NIAAA, 2014-2019, Role: PI.

### *Reducing Offenders' HIV Risk: MI Enhanced Case Management with Drug-Free Housing*

To decrease HIV risk among offenders, reduce recidivism, and address the variety of problems that this population presents, this study combines community based residential recovery homes for offenders (sober living houses) with a new Motivational Interviewing Case Management intervention. Participants (N=330) are randomly assigned to sober living houses plus a standard single session of MI or sober living houses plus Motivational Interviewing Case Management. Study participants are followed up for 12 months. Study measures assess drug and alcohol use, psychiatric symptoms, HIV risk, trauma, arrests, and a variety of other outcomes. Qualitative interviews target client experiences of the MI-based intervention and experiences living in a sober living house. NIDA, 2013-2018, Role: PI.

### *Enhancing Engagement and Retention in Quality HIV Care for Transgender Women of Color in Oakland, Alameda County*

This 5-year Butterfly Project will identify a total of 900 high risk transgender women and enroll a total of 180 transgender women who live with HIV in the Butterfly Project (20 in year 1 and 40 each year in year 2 through 5). The Butterfly Project will utilize innovative intervention programs with multiple techniques to engage and retain African American transgender women who live with HIV. In addition, the Butterfly Project will increase the capacity of transgender communities in Alameda County through operating the Butterfly Nest, a store-front safe place for transgender women of color, where weekly support groups and health promotion workshops will be held. Local measures will be developed to evaluate the effectiveness and impact of the Butterfly Project. Health Resources and Services Administration, 2012-2017, Role: Co-Investigator/Clinical Supervisor.

### *Interaction of Mental Health and Social Support on Drug Relapse in Recovery Homes*

This study will assess the interaction of mental health symptoms and social support on drug and alcohol outcomes in 300 residents of sober living houses. We hypothesize that

17

Douglas L. Polcin, Ed.D., MFT

social support will moderate destructive impacts of mental health symptoms and promote sustained recovery. NIDA, 2014-2016, Role: PI.

### Previous Projects

#### *Moderators of Motivation to Maintain Sobriety over Eighteen Months*
This grant is a secondary analysis of data from *An Evaluation of Sober Living Houses*. Correlates of moderators of motivation to maintain abstinence will be assessed along with moderator effects. The study will be one of the first to assess longitudinal measures of motivation in a non-treatment setting. NIDA, 2013-2015, Role: PI

#### *Health Intervention Project for Transgender Women*
This project aims to prevent substance abuse and HIV risk behaviors among transgender women of color in Alameda and San Francisco counties. The project targets high-risk and young-adult transgender women (age 18 to 24) who are engaging in substance abuse and HIV-related sexual risk behaviors. Based on evidence based intervention programs, we will develop, implement, and evaluate a motivational enhancement intervention (MEI) which will be adapted and tailored to high risk transgender women of color. Outcome measures include HIV risk, substance use, and mental health problems. SAMHSA, 2010-2015, Role: Co-Investigator/ Clinical Supervisor.

#### *Intensive Motivational Interviewing for Methamphetamine Dependence*
This study tested the efficacy of a randomized clinical trial of a new manual intervention, intensive motivational interviewing (IMI), for 220 persons with methamphetamine dependence. Participants in treatment at an outpatient facility were randomly assigned to IMI or a standard single session of MI. Bothe groups received standard group treatment. Results showed significant reduction in methamphetamine use for both study conditions. IMI was more effective than standard MI for reducing psychiatric symptoms and drinking among women. NIDA, 2009-2014, Role: PI.

#### *Substance Abuse and HIV Prevention for high risk API MSM in Alameda and San Francisco Counties*
The major goal of this intervention project was to implement motivational enhancement therapy for high risk API MSM to reduce their substance use and HIV risk behaviors in collaboration with local AIDS service and mental health service agencies in Alameda and San Francisco counties. Participants improved mental health issues, particularly addressing homophobia and family issues that are unique to Asian culture. SAMHSA, 2008-2013, Role: Co-Investigator/Clinical Supervisor.

#### *Community Impact on Adoption of Sober Living Houses*
The primary aim of the study was to examine how stakeholder groups in the community (e.g., neighbors of sober living houses, human service professionals, criminal justice staff, and local government officials) viewed sober living houses. We also examined how their attitudes support and hinder operations of the houses and the potential for expansion. There was widespread support for the houses among all stakeholder groups and individuals who were most familiar with the houses had the strongest positive

Douglas L. Polcin, Ed.D., MFT

views.  Criticisms were limited to issues such as parking near sober living houses that had large households.  NIDA, 2010-2012, Role: PI.

### *An Evaluation of Sober Living Houses*

This study investigated longitudinal alcohol, drug, mental health and other outcomes for individuals residing in sober living houses.  Significant improvements were reported for alcohol and drug use, alcohol and drug related problems, legal problems, psychiatric symptoms and employment. Qualitative interviews showed that supportive confrontation, particularly from other recovering persons, was experienced as helpful. NIAAA, 2003-2009, Role: PI.

### *Motivational Enhancement Therapy to Improve Treatment Utilization and Outcome in Pregnant Substance Abusers*

This study investigated the effectiveness of a 3-session Motivational Enhancement Therapy intervention at the beginning of outpatient treatment. No overall differences were found, although there was some variation by race, with African American Women using substance somewhat less than whites.
NIDA Clinical Trials Network, 2003-2005, Role: Paid consultant.

### *Clinical Trials Network: UCLA Research Node, Haight Ashbury Free Clinics Subcontract*

The UCLA CTN Node participated in research on treatment practices within and across CTN Nodes.  Dr. Polcin was a co-investigator, trainer and clinical supervisor CTN studies of MI and MET.  Studies were designed to test whether MET and MI could be learned by counselors employed in community programs and whether they were more effective than treatment as usual.  A random assignment design was employed at 11 different treatment sites.  Fidelity monitoring showed MI and MET were delivered with competence and adherence to the intervention manual.  Results for the MI intervention showed increased retention relative to treatment as usual.  MET showed outcomes that differed across study sites.  NIDA Clinical Trials Network, 1999-2004, Role: Co-Investigator for CTN project 0004.

Douglas L. Polcin, Ed.D., MFT

Douglas L. Polcin, Ed.D., MFT

# EXHIBIT 2

NIH Public Access
**Author Manuscript**
*J Psychoactive Drugs*. Author manuscript; available in PMC 2011 March 15.

Published in final edited form as:
*J Psychoactive Drugs*. 2010 December ; 42(4): 425–433.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

# What Did We Learn from Our Study on Sober Living Houses and Where Do We Go from Here?

**Douglas L. Polcin, Ed.D.**[*], **Rachael Korcha, M.A.**[*], **Jason Bond, Ph.D.**[*], and **Gantt Galloway, Pharm.D.**[**]

[*]Alcohol Research Group Public Health Institute 6475 Christie Avenue, Suite 400 Emeryville, CA 94608-1010

[**]California Pacific Medical Center St. Luke's Hospital San Francisco, CA

## Abstract

Lack of a stable, alcohol and drug free living environment can be a serious obstacle to sustained abstinence. Destructive living environments can derail recovery for even highly motivated individuals. Sober living houses (SLHs) are alcohol and drug free living environments for individuals attempting to abstain from alcohol and drugs. They are not licensed or funded by state or local governments and the residents themselves pay for costs. The philosophy of recovery emphasizes 12-step group attendance and peer support. We studied 300 individuals entering two different types of SLHs over an 18 month period. This paper summarizes our published findings documenting resident improvement on measures of alcohol and drug use, employment, arrests, and psychiatric symptoms. Involvement in 12-step groups and characteristics of the social network were strong predictors of outcome, reaffirming the importance of social and environmental factors in recovery. The paper adds to our previous reports by providing a discussion of implications for treatment and criminal justice systems. We also describe the next steps in our research on SLHs, which will include: 1) an attempt to improve outcomes for residents referred from the criminal justice system and 2) a depiction of how attitudes of stakeholder groups create a community context that can facilitate and hinder the legitimacy of SLHs as a recovery modality.

### Keywords

Sober Living House; Residential Treatment; Recovery House; Social Model; Communal Living

## Introduction

Research continues to document the important role of social factors in recovery outcome (Polcin, Korcha, Bond, Galloway & Lapp, in press). For example, in a study of problem and dependent drinkers Beattie and Longabaugh (1999) found that social support was associated with drinking outcome. Not surprising, the best outcomes were predicted by *alcohol-specific* social support that discouraged drinking. Similarly, Zywiak, Longabaugh and Wirtz (2002) found that clients who had social networks with a higher number of abstainers and recovering alcoholics had better outcome 3 years after treatment completion. Moos and Moos (2006) studied a large sample of 461 treated and untreated individuals with alcohol use disorders over a 16 year period to examine factors associated with relapse. They found that social support for recovery was important in establishing sustained abstinence. Finally, Bond, Kaskutas and Weisner (2003) reached a similar conclusion in a 3-year follow up

Phone (510) 597-3440 Fax (510) 985-6459 DPolcin@arg.org

study on 655 alcohol dependent individuals who were seeking treatment. Abstinence from alcohol was associated with social support for sobriety and involvement in Alcoholics Anonymous.

A critically important aspect of one's social network is their living environment. Recognition of the importance of one's living environment led to a proliferation of inpatient and residential treatment programs during the 1960' and 70's (White, 1998). The idea was to remove clients from destructive living environments that encouraged substance use and create new social support systems in treatment. Some programs created halfway houses where clients could reside after they completed residential treatment or while they attended outpatient treatment. A variety of studies showed that halfway houses improved treatment outcome (Braucht, Reichardt, Geissler, & Bormann, 1995; Hitchcock, Stainback, & Roque, 1995; Milby, Schumacher, Wallace, Freedman & Vuchinich, 2005; Schinka, Francis, Hughes, LaLone, & Flynn, 1998).

Despite the advantages of halfway houses, there are limitations as well (Polcin & Henderson, 2008). First, there is typically a limit on how long residents can stay. After some period of time, usually several months, residents are required to move out whether or not they feel ready for independent living. A second issue is financing the houses, which often includes government funding. This leaves facilities vulnerable to funding cuts. Finally, halfway houses require residents to have completed or be involved in some type of formal treatment. For a variety of reasons some individuals may want to avoid formal treatment programs. Some may have had negative experiences in treatment and therefore seek out alternative paths to recovery. Others may have relapsed after treatment and therefore feel the need for increased support for abstinence. However, they may want to avoid the level of commitment involved in reentering a formal treatment program. Sober living houses (SLHs) are alcohol and drug free living environments that offer peer support for recovery outside the context of treatment.

## Characteristics of Sober Living Houses

Sober Living Houses are structured in a way that avoids some of the limitations of halfway houses. The essential characteristics include: 1) an alcohol and drug free living environment for individuals attempting to abstain from alcohol and drugs, 2) no formal treatment services but either mandated or strongly encouraged attendance at 12-step self-help groups such as Alcoholics Anonymous (AA), 3) required compliance with house rules such as maintaining abstinence, paying rent and other fees, participating in house chores and attending house meetings, 4) resident responsibility for financing rent and other costs, and 5) an invitation for residents to stay in the house as long as they wish provided they comply with house rules (Polcin & Henderson, 2008).

SLHs have their origins in the state of California and most continue to be located there (Polcin & Henderson, 2008). It is difficult to ascertain the exact number because they are not formal treatment programs and are therefore outside the purview of state licensing agencies. However, in California many SLHs are affiliated with coalitions or associations that monitor health, safety, quality and adherence to a peer-oriented model of recovery, such as the California Association of Addiction Recovery Resources (CAARR) or the Sober Living Network (SLN). Over 24 agencies affiliated with CAARR offer clean and sober living services. The SLN has over 500 individual houses among it membership.

While some SLHs use a "strong manager" model where the owner or manager of the house develops and enforces the house rules, contemporary SLH associations such as CAARR and SLN emphasize a "social model approach" to managing houses that empowers residents by providing leadership position and forums where they can have input into decision making

(Polcin & Henderson, 2008). Some houses have a "residents' council," which functions as a type of government for the house.

## Recovery Philosophy in Sober Living Houses

Central to recovery in SLHs is involvement in 12-step mutual help groups (Polcin & Henderson, 2008). Residents are usually required or strongly encouraged to attend meetings and actively work a 12-step recovery program (e.g., obtain a sponsor, practice the 12 steps, and volunteer for service positions that support meetings). However, some houses will allow other types of activities that can substitute for 12 step groups, provided they constitute a strategy for maintaining ongoing abstinence.

Developing a social network that supports ongoing sobriety is also an important component of the recovery model used in SLHs. Residents are encouraged to provide mutual support and encouragement for recovery with fellow peers in the house. Those who have been in the house the longest and who have more time in recovery are especially encouraged to provide support to new residents. This type of "giving back" is consistent with a principle of recovery in 12-step groups. Residents are also encouraged to avoid friends and family who might encourage them to use alcohol and drugs, particularly individuals with whom they have used substances in the past (Polcin, Korcha, Bond, Galloway & Lapp, in press).

## Purpose

There are several primary aims for this paper. First is to summarize key outcomes from our study, "An Evaluation of Sober Living Houses," which was a 5- year study funded by the National Institute on Alcohol Abuse and Alcoholism (NIAAA) (i.e., Korcha, Polcin, Bond & Galloway, 2010; Polcin, 2009; Polcin & Henderson, 2008; Polcin, Korcha, Bond & Galloway, 2010; Polcin, Korcha, Bond & Galloway, in press; Polcin, Korcha, Bond, Galloway & Lapp in press). Second is to expand on these findings by considering potential implications of our research for inpatient and outpatient treatment and for criminal justice systems. Third is to describe the next steps in our research on SLHs. These include plans to study the community context of SLHs by examining attitudes of community stakeholder groups (e.g., neighbors, local government officials, mental health therapists, criminal justice professionals and practitioners in substance abuse treatment programs). We also describe plans to conduct studies of resident subgroups, such as individuals referred from the criminal justice system.

## Data Collection Sites

The study was designed to assess outcomes for 300 individuals entering two types of SLHs: 1) Options Recovery Services (ORS) in Berkeley, California was an adapted model of SLHs in that the houses were associated with an outpatient treatment program. 2) Clean and Sober Transitional Living (CSTL) in Sacramento County, California consisted of freestanding houses that were not affiliated with any type of treatment. The descriptions of CSLT and ORS that follow are summaries of Polcin and Henderson (2008), Polcin (2009) and Polcin, Korcha, Bond, Galloway & Lapp (in press).

### Clean and Sober Transitional Living (CSTL)

CSLT is located in Sacramento County California and consists of 16 houses with a 136 bed capacity. Residency at CSTL is divided into two phases. Phase I lasts 30 to 90 days and is designed to provide some limits and structure for new residents. Residents must agree to abide by a curfew and attend at 12-step meetings five times per week. The purpose of these

requirements is to help residents successfully transition into the facility, adapt to the SLH environment, and develop a stable recovery program.

The second phase allows for more personal autonomy and increased responsibility for one's recovery. Curfews and requirements for 12-step attendance are reduced. All residents, regardless of phase, are required to be active in 12-step recovery programs, abide by basic house rules, and abstain from alcohol and drugs. A "Resident Congress" consisting of current residents and alumni helps enforce house rules and provides input into the management of the houses. Although the owner/operator of the houses is ultimately responsible, she/he defers to the Residents Congress as much as possible to maintain a peer oriented approach to recovery. In order to be admitted to CSTL prospective residents must have begun some type of recovery program prior to their application.

### Options Recovery Services (ORS)

ORS is an outpatient substance abuse treatment program located in Berkeley, California that treats approximately 800 clients per year. Most of the clients are low income and many have history of being homeless at some point in their lives. Because a large number do not have a stable living environment that supports abstinence from alcohol and drugs, ORS developed SLHs where clients can live while they attend the outpatient program. Currently there are 4 houses with 58 beds. The houses are different from freestanding SLHs, such as those at CSTL, because all residents must be involved in the outpatient program. Most residents enter the houses after residing in a short term homeless shelter located near the program. At admission, nearly all residents are eligible for some type of government assistance (e.g., general assistance or social security disability) and use those funds to pay SLH fees. To help limit social isolation and reduce costs residents share bedrooms. Like other SLH models of recovery, residence are free to stay as long as they wish provide they comply with house rules (e.g., curfews, attendance at 12-step meetings) and fulfill their financial obligations. Also like other SLH models, each house has a house manager who is responsible for ensuring house rules and requirements are followed. ORS does not have any type of Residents Council, but house managers meet regularly with the executive director and have input into operation of the SLHs in during these contacts.

## Procedures

Participants were interviewed within their first week of entering a sober living house and again at 6-, 12-, and 18-month follow up. To maximize generalization of findings, very few exclusion criteria were used and very few residents declined to participate. Primary outcomes consisted of self report measures of alcohol and drug use. Secondary outcomes included measures of legal, employment, medical, psychiatric and family problems. Some measures assessed the entire 6 months between data collection time points. Others, such as the Addiction Severity Index, assessed shorter time periods of 30 days or less.

### Measures

**1) Demographic Characteristics**—included standard demographic questions such as age, gender, ethnicity, marital status, and education.

**2) Addiction Severity Index Lite (ASI)**—The ASI is a standardized, structured interview that assesses problem severity in six areas: medical, employment/support, drug/ alcohol, legal, family/social and psychological (McLellan et al., 1992). Each of the six areas is scored for 0 (low) to 1 (high).

**3) Psychiatric symptoms—**To assess current psychiatric severity we used the Brief Symptom Inventory (Derogatis & Melisaratos, 1983). This 53-item measure assesses severity of psychiatric symptoms on nine clinical scales as well as three global indices. Items are rated on a 5-point scale and ask about symptoms over the past 7 days. We used the Global Severity Index (GSI) as an overall measure of psychiatric severity.

**4) Six month measures of alcohol and drug use—**These measures were taken from Gerstein et al. (1994) and labeled Peak Density and 6-month abstinence. *Peak Density* is the number of days of any substance use (i.e., any alcohol or drug) during the month of highest use over the past 6 months (coded 0-31). *Six-month abstinence* was a dichotomous yes/no regarding any use of alcohol of drugs over the past 6 months.

**5) Arrests—**This measure was taken from Gerstein et al. (1994) and was defined as number of arrests over the past 6 months.

Two additional measures were included as covariates because they assess factors emphasized by as important to recovery in SLHs.

**6) Alcoholics Anonymous Affiliation Scale—**This measure includes 9 items and was developed by Humphreys, Kaskutas and Weisner (1998) to measure the strength of an individual's affiliation with AA. The scale includes a number of items beyond attendance at meetings, including questions about sponsorship, spirituality, and volunteer service positions at meetings.

**7) Drinking and drug use status in the social network—**These measures were taken from the Important People Instrument (Zywiak, et al., 2002). The instrument allows participants to identify up to 12 important people in his or her network whom they have had contact with in the past six months. Information on the type of relationship (e.g., spouse, friend), amount of contact over the past 6 months (e.g., daily, once or twice a week) and drug and alcohol use over the past 6 months (e.g., heavy user, light user, in recovery) was obtained for each person in the social network. The drinking status of the social network was calculated by multiplying the amount of contact by the drinking pattern of each network member, averaged across the network. The same method is applied to obtain the drug status of the network member; the amount of contact is multiplied by the pattern of drug use and averaged across network members.

## Hypotheses

Hypotheses suggested that we would find two types of longitudinal outcomes: 1) Individuals entering the houses with higher severity of problems would show significant improvement between baseline and 6 months and those improvements would be maintained at 12 and 18 months and 2) Individuals entering houses with low severity would maintain low severity at all follow up time points. It was expected that measures of social support for sobriety and 12-step involvement would be associated with primary outcomes.

The study design used repeated measures analyses to test how study measures varied over time. Because the two types of houses served residents with different demographic characteristics, we conducted disaggregated longitudinal analyses for each. For a more complete description of the study design and collection of data see Polcin et al. (2010), Polcin et al. (in press) and Polcin, Korcha, Bond, Galloway and Lapp (in press).

### Data Collection

At CSTL we recruited 245 individuals within their first week of entering the houses. Most were men (77%), white (72.5%) and middle age (mean=38, se=0.65). Over 75% had at least a high school education or GED. The most common referral source was self, family or friend (44%) followed by criminal justice (29%) and inpatient treatment (15%). Over a third (35%) of the sample indicated that jail or prison had been their usual housing situation over the past 6 months and few reported any type of stable housing over the past 6 months. Just 7% reported renting an apartment as their primary housing, while 23% reported staying with family or friends and 12% reported homeless as their primary living situation

ORS had 4 houses, where we recruited 55 participants. Most were African American (59%), while 30% were white. The mean age was 43 years (se=1.2). Most residents had completed high school or a GED (73%). Nearly half of the residents had been self referred of referred by family or friends. About 24% were criminal justice referrals and a third had spent some time in a controlled environment during the month before entering the house. Many of the residents had histories of homelessness. When asked to indicate their usual housing situation the past six months, a third indicated homeless or in a shelter.

Follow up rates for CSLT were 72% at 6 months, 71% at 12 months ad 73% at 18 months. However, 89% of the sample (N=218) participated in at least one follow up interview. The proportions successfully followed up at ORS were similar at 12 and 18 months (76% and 71% respectively) but higher at 6 months (86%). To address the issue of missing data from individuals who we were not able to locate for follow up interviews, we used analytic methods that did not require participants to complete 0interviews at all time points to be include in the analysis. These included generalized estimated equations (GEE) and mixed model regressions. In addition, when we compared baseline characteristics of individuals successfully located and interviewed with those lost at follow up we did not find significant differences. However, individuals who we were not able to follow up did have shorter lengths of stay in the SLHs.

## Main Findings

Detailed descriptions of analytic methods and statistical results have been reported in Polcin, Korcha, Bond, & Galloway (2010), Polcin Korcha, Bond, & Galloway (in press), and Polcin Korcha, Bond, Galloway & Lapp (in press). Our purpose here is to summarize the most salient and relevant findings for SLHs as a community based recovery option. We then expand on the findings by considering potential implications of SLHs for treatment and criminal justice systems. We also include a discussion of our plans to study the community context of SLHs, which will depict how stakeholder influences support and hinder their operations and potential for expansion.

### Retention

Retention of residents in the sober living houses was excellent. Average lengths of stay in both types of sober living houses surpassed the National Institute on Drug Abuse recommendation of at least 90 days to obtain maximum benefit. The average length of stay at ORS was 254 days (se=169 days) and at CSLT it was 166 days (se=163).

### Primary Outcomes

As hypothesized, there were two patterns of outcome for our primary outcome variables. One pattern was that residents reduced or stopped their substance use between baseline and 6 month follow up and then maintained those improvements at 12 and 18 months. This was the case for both substance use measures that assessed 6 month period of time: 1) complete

abstinence over the 6 months and 2) maximum number of days of any substance use during the month of highest use. For example, at ORS 6-month abstinence rates improved from 11% at baseline to 68% at 6- and 12-months. At 18 months abstinence was a bit lower, (46%) but still significantly better than the time period before they entered the houses. For CSLT, abstinence improved from 20% at baseline, to 40% at 6 months, 45% at 12 months and 42% at 18 months. Maximum number of days of use per month at ORS on average declined from 19 days per month at baseline, to 3 days at 6 months, 4 days at 12 months and 7 days at 18 months. CSLT declined from 19 days at baseline, to 11 days at 6 months, 9 days at 12 months and 13 days at 18 months.

Findings on the ASI alcohol and drug scales measuring the past 30 days reflected different patterns. At CSLT, residents entered with low alcohol (mean=0.16, se=0.02) and drug (mean=0.08, se=0.01) severity. Because severity was low there was limited room to improve on these measures. Nevertheless, we found significant improvement at 6 months for both alcohol (mean=0.10, se=0.02) and drug (mean=0.05, se=0.01). Those improvements were maintained at 12 and 18 months. At ORS, residents entered with even lower alcohol (mean=0.07, se=0.02) and drug (mean=0.05, se=0.01) severity that was maintained at 6, 12 and 18 month follow up. Potential reasons for low alcohol and drug severity at baseline included large proportions spending some time in a controlled environment during the 30 days before they entered the houses. In addition, many residents had begun working on a recovery program shortly before they entered the houses (e.g., attending 12-step meetings). In fact, the ORS program typically required 30 days of abstinence before being eligible to enter the residence.

It was noteworthy that a wide variety of individuals in both programs had positive outcomes. There were no significant differences within either program on outcomes among demographic subgroups or different referral sources. In addition, it is important to note that residents were able to maintain improvements even after they left the SLHs. At 12 months 68% had left ORS and 82% had left CSLT. By 18 months nearly all had left, yet improvements were for the most part maintained.

### Secondary Outcomes

There were also improvements noted on the secondary outcome measures. At CSTL these included improvements on employment, psychiatric symptoms, and arrests. The pattern was again significant improvement between baseline and 6 months that was generally maintained at 12 and 18 months. The percent arrested 6 months pre-baseline was 42%, which dropped to 26% at 6-month follow up and 22% at 12 months. There was a light increase at 18 months (28%), which was still significantly lower than pre-baseline. Employment severity on the ASI improved from a mean of 0.76(se=0.02) at baseline to a mean of 0.53(se=0.02) at six months. At 12 months the mean was 0.54(se=0.03), which increased only slightly at 18 months (mean=0.59, se=0.02). Psychiatric symptoms improved from a mean of 0.83(se=0.05) at baseline to 0.69(se=0.05) at 6 months. By 18 months there was a bit of an increase (mean=0.72, se=0.06), which was no longer statistically significant but was still a statistical trend (p<.10).

At ORS there were similar patterns of improvement on employment and arrests. From baseline to 6 months the average score on the ASI employment scale improved from 0.61 (se=0.02) to 0.51 (se= 0.03) and was maintained at 12 and 18 months. The odds of being arrested were reduced from baseline to 6 months by 80% and even further reduced at 12 and 18 months.

NIH-PA Author Manuscript    NIH-PA Author Manuscript    NIH-PA Author Manuscript

**Factors that Predicted Outcome**

In addition to documenting longitudinal outcomes, we were interested in assessing factors that predicted outcomes. Using GEE models that assessed a variety of factors across data collection time points we found involvement in 12-step groups to be the strongest predictor of our primary outcomes. For CSLT, 12-step involvement was associated with being abstinent for at least 6 months (p<.001), lower maximum days of substance us per month (p<.001, and fewer arrests (p<.01). For ORS, 12-step involvement was associated with abstinent for at least 6 months (p<.05), lower maximum days of substance us per month (p<. 01), and lower ASI legal severity (p<.05).

We also examined how drinking and drug use in the participant's social network related to outcomes. At CSLT we found heavier drinking and drug use in the social network was related to worse outcome on all alcohol and drug outcome measures (p<.01 for all variables). At ORS the findings were mixed. There was a significant relationship between maximum number of days of substance use per month and drinking in the social network (p<.05) and drug use in the social network (p<.01). However, there were no significant relationships between social network variables and abstinence. In addition, for the ASI alcohol and drug scales at ORS, the only significant association with social network variables was heavier drug use in the social network predicting ASI alcohol outcome (p<. 01).

In a recent analysis of CSTL residents we looked at psychiatric severity as a predictor of alcohol and drug outcome using growth curve models (Korcha et al (2010). We found that a subgroup of about a third of the residents had significantly higher psychiatric severity than other residents and had significantly worse outcomes. Our work on identifying and describing these residents with worse outcome is continuing.

## Limitations

There are several limitations to the study that are important to consider. First, we could not directly compare which type of SLH was most effective because there were demographic and other individual characteristics that differed between the two types of houses. Second, individuals self selected themselves into the houses and a priori characteristics of these individuals may have at least in part accounted for the longitudinal improvements. Although self selection can be viewed as a weakness of the research designs, it can also be conceived as a strength, especially for studying residential recovery programs. Our study design had characteristics that DeLeon, Inciardi and Martin (1995) suggested were critical to studies of residential recovery programs. They argued that self selection of participants to the interventions being studies was an advantage because it mirrored the way individuals typically choose to enter treatment. Thus, self selection was integral to the intervention being studied and without self selection it was difficult to argue that a valid examination of the invention had been conducted. In their view, random assignment of participants to conditions was often appropriate for medication studies but often inappropriately applied when used to study residential services for recovery from addiction.

## Significance of the Study

Our study represents the first examination of sober living house residents using a longitudinal design. To date, our papers have looked at study findings in terms of the types of improvements residents make and factors associated with outcome, the substance of which has been summarized above. One of our aims here, however, is also to look at significance from the perspective of how SLHs might impact various service systems in the community. The promising outcomes for SLH residents suggest that sober living houses

might play more substantive roles for persons: 1) completing residential treatment, 2) attending outpatient treatment, 3) seeking non-treatment alternatives for recovery, and 4) entering the community after criminal justice incarceration.

## Treatment Systems

The two types of recovery houses assessed in this study showed different strengths and weaknesses and served different types of individuals. Communities and addiction treatment systems should therefore carefully assess the types of recovery housing that might be most helpful to their communities. Several considerations are reviewed below.

Outpatient programs in low income urban areas might find the Options Recovery Services model of SLHs helpful. Relative to the other housing programs, this model was inexpensive and the houses were conveniently located near the outpatient facility. Typically, residents entered these SLHs after establishing some period of sobriety while they resided in a nearby shelter and attended the outpatient program. A significant strength of the Options houses was that residents were able to maintain low alcohol and drug severity at 12-month follow up.

There are several significant advantages of establishing SLHs associated with outpatient treatment as apposed to traditional halfway houses. First, residents in SLHs are free to stay as long as they wish after completing the outpatient program as long as they abide by program rules. This eliminates arbitrary discharge dates determined by the program, a procedure often used by halfway houses to free up beds. Rather, the resident is able to decide when he or she is ready to transition to more independence. Among other things, this eliminates the need to move to questionable living environments that might not support recovery due to time limitations. SLHs are also less costly than halfway houses, which are usually funded by treatment programs.

SLHs combined with outpatient treatment may be especially valuable to resource poor communities that do not have funds to establish residential treatment programs or have the income levels that could support freestanding sober living houses which are more expensive. Most of the rent for the Options SLHs was paid by General Assistance or Social Security Income, so a variety of low income residents could be accommodated. While the level of support is less intensive (and less expensive) than that offered in residential treatment, it is more intensive than the relative autonomy found in freestanding SLHs. Some residents probably benefit from the mandate that they attend outpatient treatment during the day and comply with a curfew in the evening. For some individuals, the limited structure offered by freestanding SLHs could invite association with substance using friends and family and thus precipitate relapse. This could be particularly problematic in poor communities where residents have easy access to substances and people who use them.

## Freestanding SLHs

The roles that freestanding SLHs can play in communities are different from SLHs that are associated with outpatient treatment. First, freestanding houses are often used by individuals who have some previous experience with residential treatment. While some of these individuals transition directly from the inpatient program to the SLH, others enter the houses after some post-treatment period in the community. They may slip, relapse or feel vulnerable to relapse, but for a variety of reasons not want to reenter a formal treatment program. Nevertheless, they may feel the need to take action and get support for reestablishing abstinence. Freestanding SLHs can be a good match for these individuals because they offer support for sobriety outside the context of formal treatment.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Freestanding SLH's offer a limited amount of structure and no formal treatment services. Thus, they are optimal for residents who are capable of handling a fair amount of autonomy and who can take personal responsibility for their recovery. Despite these limitations, CSLT appeared to benefit many different types of residents who were referred from an array of personal and institutional sources (i.e., self, family, criminal justice systems, and inpatient treatment programs). Expansion of freestanding SLHs in communities might therefore ease the burden on overwhelmed treatment systems. In communities that are unable to fund a sufficient number of treatment programs for individuals with substance use disorders, freestanding SLHs might be a clinically and economically effective alternative. The availability of treatment slots for individuals released from jail or prison or particularly lacking. For some those offenders who are motivated for abstinence and capable of handling some degree of autonomy SLHs might be a viable and effective option for recovery that is currently underutilized.

### Criminal Justice Systems

Prison and jail overcrowding in the U.S. has reached a crisis point. Each year more than 7 million individuals are released from local jails into communities and over 600,000 are released on parole from prison (Freudenberg, Daniels, Crum, Perkins & Richie, 2005). Although the need for alcohol and drug treatment among this population is high, very few receive services during or after their incarceration. In California, studies show that few offenders being released from state prisons have adequate housing options and in urban areas such as San Francisco and Los Angeles up to a third become homeless (Petersilia, 2003). Housing instability has contributed to high reincarceration rates in California, with up to two-thirds of parolees are reincarcerated within three years. In a study of women offenders released from jails in New York City 71% indicated that lack of adequate housing was their primary concern.

Despite the enormous need for housing among the offender population, SLHs have been largely overlooked as a housing option for them (Polcin, 2006c). This is particularly concerning because our analysis of criminal justice offenders in SLHs showed alcohol and drug outcomes that were similar to residents who entered the houses voluntarily. However, as reviewed elsewhere (i.e., Polcin, 2006c), SLHs need to carefully target criminal justice involved individuals so that they select offenders that have sufficient motivation to remain abstinent and are able to meet their financial obligations.

## Where do We go from Here?

There are multiple directions one could go in pursuit of additional research on SLHs. For example, studies comparing different living situations for individuals in early recovery could help highlight the relative strengths and weaknesses of SLHs. In addition, longer follow up time periods could be assessed as well as outcomes for a wider variety of subgroups. These might include minority groups, larger samples of women, and a variety of individual level characteristics not assessed here (e.g., self efficacy and interpersonal skills). However, we have opted to look at two topics that we think are of immediate relevance to communities: 1) documenting and improving outcomes for criminal justice referred residents and 2) understanding the community context within which SLHs operate.

### Improving Outcomes for Criminal Justice Referred Residents

Findings from our study suggested that alcohol and drug outcomes for residents referred from the criminal justice system were equivalent to that of voluntary residents. However, offenders did not fare as well as others in two areas: finding and maintaining employment and avoiding arrests. In addition, the numbers of criminal justice referred residents was

relatively small and an examination of a larger sample of offenders is warranted. Among other things, the larger sample would enable us to identify predictors of outcome among offenders. The field would therefore be better equipped to identify those offenders who are more likely to do well in SLHs.

In addition to studying a larger number of offenders, we hope to explore an innovative intervention designed to improve outcomes for these residents in terms of employment, arrests, and other areas. Toward that end, we are in the process of developing a Motivational Interviewing Case Management (MICM) intervention designed to help offenders successfully transition into SLHs, avoid rearrest by complying with the terms of probation or parole, and succeed in activities that support successful transition into the community (e.g., employment). Our intervention modifies motivational interviewing to address the specific needs of the offender population (Polcin, 2006b). Specifically, it helps residents resolve their mixed feelings (i.e., ambivalence) about living in the SLH and engaging in other community based services. Thus, the intervention is a way to help them prepare for the challenges and recognize the potential benefits of new activities and experiences.

### Assessing the Impact of the Community Context

The fact that residents in SLHs make improvement over time does not necessarily mean that SLHs will find acceptance in the community. In fact, one of the most frustrating issues for addiction researchers is the extent to which interventions that have been shown to be effective are not implemented in community programs. We suggest that efforts to translate research into treatment have not sufficiently appreciated how interventions are perceived and affected by various stakeholder groups (Polcin, 2006a). We therefore suggest that there is a need to pay attention to the community context where those interventions are delivered.

As a next step in our research on SLHs we plan to assess how they are viewed by various stakeholder groups in the community, including house managers, neighbors, treatment professionals, and local government officials. Interviews will elicit their knowledge about addiction, recovery, and community based recovery houses such as SLHs. Their perceptions of the strengths and weaknesses of SLHs in their communities should provide data that can be used to modify houses to improve acceptance and expand to serve more drug and alcohol dependent persons. We hypothesize that barriers to expansion of SLHs might vary by stakeholder groups. Different strategies may be needed for those who lack information about SLHs, have beliefs that they are not effective, have allegiances to other treatment approaches, have views that minimize social factors in recovery, and live in communities where public policy hinders expansion of SLHs. Drug and alcohol administrators and operators of houses might therefore need different strategies to address the concerns of different stakeholders.

## Conclusion

Many individuals attempting to abstain from alcohol and drugs do not have access to appropriate housing that supports sustained recovery. Our study found positive longitudinal outcomes for 300 individuals living in two different types of SLHs, which suggests they might be an effective option for those in need of alcohol- and drug-free housing. Improvements were noted in alcohol and drug use, arrests, psychiatric symptoms and employment. Owners and operators of SLHs should pay attention to factors that predicted better alcohol and drug outcomes, including higher involvement in 12-step meetings, lower alcohol and drug use in the social network, and lower psychiatric severity. Although criminal justice referred residents had alcohol and drug use outcomes that were similar to other residents, they had a harder time finding and keeping work and had higher rearrest rates. Areas for further research include testing innovative interventions to improve criminal

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

justice outcomes, such as Motivational Interviewing Case Management (MICM) and examining the community context of SLHs. Recognizing stakeholder views that hinder and support SLHs will be essential if they are to expand to better meet the housing needs of persons suffering from alcohol and drug disorders.

## Acknowledgments

Supported by R01AA14030 and R21DA025208

## References

Beattie MC, Longabaugh R. General and alcohol-specific social support following treatment. Addictive Behaviors 1999;24:593–606. [PubMed: 10574299]

Bond J, Kaskutas LA, Weisner C. The persistent influence of social networks and Alcoholics Anonymous on abstinence. Journal of Studies on Alcohol 2003;64:579–588. [PubMed: 12921201]

Braucht BG, Reichardt CS, Geissler LJ, Bormann CA. Effective services for homeless substance abusers. Journal of Addictive Disease 1995;14:87–109.

De Leon G, Inciardi JA, Martin SS. Residential drug abuse treatment research: are conventional control designs appropriate for assessing treatment effectiveness? Journal of Psychoactive Drugs 1995;27(1):85–91. [PubMed: 7602444]

Derogatis LR, Melisaratos N. The Brief Symptom Inventory: An introductory report. Psychological Medicine 1983;13:595–605. [PubMed: 6622612]

Freudenberg N, Daniels J, Crum M, Perkins T, Richie BE. Coming Home From Jail: The Social and Health Consequences of Community Reentry for Women, Male Adolescents, and Their Families and Communities. American Journal of Public Health 2005;95:1725–1736. [PubMed: 16186451]

Gerstein, DR.; Johnson, RA.; Harwood, HJ.; Fountain, D.; Sutter, N.; Malloy, K. Evaluating recovery services: The California drug and alcohol treatment assessment (Contract No. 92-001100). California Department of Alcohol and Drug Programs; Sacramento: 1994.

Hitchcock HC, Stainback RD, Roque GM. Effects of halfway house placement on retention of patients in substance abuse aftercare. American Journal of Alcohol and drug Abuse 1995;21:379–390.

Humphries K, Kaskutas L, Weisner C. The Alcoholics Anonymous Affiliation Scale: development, reliability, and norms for diverse treated and untreated populations. Alcoholism: Clinical and Experimental Research 1998;22:974–8.

Korcha, RA.; Polcin, DL.; Bond, JC.; Galloway, GP. Psychiatric distress and substance use outcomes among sober living residents; 33rd Annual Research Society on Alcoholism Scientific Meeting; San Antonio, TX. Jun. 2010 p. 26-30.

McLellan AT, Cacciola J, Kushner H, Peters F, Smith I, Pettinati H. The fifth edition of the addiction Severity Index: Cautions, additions, and normative data. Journal of Substance Abuse Treatment 1992;9:199–213. [PubMed: 1334156]

Milby JB, Schumacher JE, Wallace D, Freedman MJ, Vuchinich RE. To house or not to house: The effects of providing housing to homeless substance abusers in treatment. American Journal of Public Health 2005;95:1259–1266. [PubMed: 15983278]

Moos RH. Theory-based processes that promote the remission of substance use disorders. Clinical Psychology Review 2007;27:537–551. [PubMed: 17254686]

Moos BS, Moos RH. Treated and untreated individuals with alcohol use disorders: Rates and predictors of remission and relapse. International Journal of Clinical and Health Psychology 2006;6:513–526.

Petersilia, J. When Prisoners Come Home: Parole and Prisoner Reentry. Oxford University Press; New York: 2003.

Polcin DL. How Health Services Research Can Help Clinical Trials Become More Community Relevant. International Journal of Drug Policy 2006a;17(3):230–237.

Polcin DL. Reexamining confrontation and motivational interviewing. Addictive Disorders and their Treatment 2006b;5(4):201–209.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Polcin DL. What about sober living houses for parolees? Criminal Justice Studies: A Critical Journal of Crime, Law and Society 2006c;19:291–300.

Polcin DL. A model for sober housing during outpatient treatment. Journal of Psychoactive Drugs 2009;41(2):153–161. [PubMed: 19705677]

Polcin DL, Henderson D. A clean and sober place to live: Philosophy, structure, and purported therapeutic factors in sober living houses. Journal of Psychoactive Drugs 2008;40(2):153–159. [PubMed: 18720664]

Polcin DL, Korcha R, Bond J, Galloway GP. Sober Living Houses for Alcohol and Drug Dependence: 18-Month Outcomes. Journal of Substance Abuse Treatment 2010;38(4):356–365. [PubMed: 20299175]

Polcin DL, Korcha R, Bond J, Galloway GP. Eighteen month outcomes for clients receiving combined outpatient treatment and sober living houses. Journal of Substance Use. in press.

Polcin DL, Korcha R, Bond J, Galloway GP, Lapp W. Recovery from addiction in two types of sober living houses: 12-month outcomes. Addiction Research and Theory. in press.

Schinka JA, Francis E, Hughes P, LaLone L, Flynn C. Comparitive outcomes and costs of inpatient care and supportive housing for substance-dependent veterans. Psychiatric Services 1998;49:946–950. [PubMed: 9661231]

White, WL. Slaying the dragon: The history of addiction treatment and recovery in America. Chestnut Health Systems; Bloomington, IL: 1998.

Zywiak WH, Longabaugh R, Wirtz PW. Decomposing the relationships between pretreatment social network characteristics and alcohol treatment outcome. Journal of Studies on Alcohol 2002;63:114–121. [PubMed: 11925053]

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

# EXHIBIT 3

Korcha et al. Addiction Science & Clinical Practice 2015, **10**(Suppl 1):A30
http://www.ascpjournal.org/content/10/S1/A30



ADDICTION SCIENCE &
CLINICAL PRACTICE

**MEETING ABSTRACT**　　　　　　　　　　　　　　　**Open Access**

# Sober living houses: research in northern and southern California

Rachael A Korcha, Douglas L Polcin*, Amy A Mericle, Jason Bond

*From* 2014 Addiction Health Services Research (AHSR) Conference
Boston, MA, USA. 15-17 October 2014

## Background
Sober living houses (SLHs) are peer-managed residences that require sobriety and household participation among residents who rent rooms on a monthly (indefinite) basis and otherwise live normal lives according to personal schedules and needs. The houses do not provide counseling or services, but regular attendance at 12-step or other types of mutual-help groups is generally required. Approximately 1000 sober living houses, members of two state-wide organizations, operate in California to serve a large and complex population. This presentation provides an overview of work conducted to date studying sober living houses in Northern and Southern California.

## Methods and results
In a study of SLHs in Northern California, 300 residents were followed for 18 months after entry. Our research found that neighbors and key informants (e.g., criminal justice, housing and political officials) were highly supportive of SLHs. Findings showed resident improvement in a variety of areas, including drug and alcohol use, employment, psychiatric symptoms, and arrests, with improvements that were maintained over the course of the study period. Although residents on parole and probation had substance use reductions that were comparable to voluntary residents, they had far more problems maintaining employment, higher rates of re-arrest and incarceration, and lower attendance to self-help groups. An ongoing randomized clinical trial in Southern California (anticipated N = 330 residents; 50 houses) is currently examining the effectiveness of an intervention to improve access to services and reduce HIV risk among sober living house residents on parole or probation. Residents randomized to the treatment condition receive a Motivational Interviewing Case Management (MICM) intervention specifically

targeted to the problems presented for each resident. The list of potential problems that MICM can address is extensive and aims to help in a variety of problem areas inclusive of: 1) adapting to the sober living house environment; 2) complying with parole and probation; 3) finding and maintaining work; 4) successfully accessing and retaining services; 5) addressing HIV risk, testing, and treatment; 6) mobilizing personal and informal resources; and 7) managing setbacks (e.g., relapse, loss of housing, loss of work). Study participants are being tracked over a 12-month time period and being assessed on criminal justice, HIV risk, and drug and alcohol outcomes.

## Conclusions
Sober living houses play an important role in helping individuals in their recovery from substance abuse, and providing additional services in these houses (MICM) to increase access to formal services may further enhance outcomes for high-risk populations.

### Acknowledgements
This presentation was developed with funding from the National Institute on Drug Abuse (R01DA034973).

Published: 20 February 2015

doi:10.1186/1940-0640-10-S1-A30
**Cite this article as:** Korcha et al.: Sober living houses: research in northern and southern California. *Addiction Science & Clinical Practice* 2015 **10**(Suppl 1):A30.

* Correspondence: dpolcin@arg.org
Alcohol Research Group, Emeryville, CA, 94608, USA



© 2015 Korcha et al; licensee BioMed Central Ltd. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/4.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited. The Creative Commons Public Domain Dedication waiver (http://creativecommons.org/publicdomain/zero/1.0/) applies to the data made available in this article, unless otherwise stated.

# EXHIBIT 4

# NIH Public Access

**Author Manuscript**

*J Psychoactive Drugs.* Author manuscript; available in PMC 2008 October 1.

Published in final edited form as:

*J Psychoactive Drugs.* 2008 June ; 40(2): 153–159.

NIH-PA Author Manuscript

# A Clean and Sober Place to Live: Philosophy, Structure, and Purported Therapeutic Factors in Sober Living Houses

**Douglas L. Polcin, Ed.D., MFT** and **Diane Henderson, B.A.**

*Alcohol Research Group, Public Health Institute, 6475 Christie Avenue, Suite 400, Emeryville, CA 94608-1010*

## Abstract

The call for evidence based practices (EBP's) in addiction treatment is nearly universal. It is a noteworthy movement in the field because treatment innovations have not always been implemented in community programs. However, other types of community based services that may be essential to sustained recovery have received less attention. This paper suggests sober living houses (SLH's) are a good example of services that have been neglected in the addiction literature that might help individuals who need an alcohol and drug-free living environment to succeed in their recovery. The paper begins with an overview of the history and philosophy of this modality and then describes our 5-year longitudinal study titled, "An Analysis of Sober Living Houses." Particular attention is paid to the structure and philosophy of SLH's and purported therapeutic factors. The paper ends with presentation of baseline data describing the residents who enter SLH's and 6-month outcomes on 130 residents.

### Keywords

Housing; Sober Living House; Recovery House; Social Model Recovery

Both addiction researchers and treatment providers are increasingly calling for more evidence based practices (EBP) (McCarty, September 6, 2006; Mee Lee, September 6, 2006; Miller, Zweben & Johnson, 2006). In recent years, considerable resources have been directed toward bridging research and treatment (Polcin, 2004). Perhaps the best known example of these efforts is the National Institute on Drug Abuse Clinical Trials Network (CTN) (National Institutes of Health, September 28, 1999). The CTN is an effort to conduct EBP trials in community based treatment programs to demonstrate generalization of EBP's to these "real world" settings.

While bridging research and treatment is an important goal in which the addiction field is making progress, community services that might play critical roles in the long term success of recovery have not received sufficient attention (Polcin, 2006a). Alcohol and drug dependent individuals with histories of homelessness, incarceration, and lack of social support for sobriety are particularly vulnerable to relapse without the provision of long term community based services that support sobriety.

This paper attempts to broaden the view of recovery beyond EBP's by describing the potential role of sober living houses (SLH's). The paper begins with a depiction of the history of SLH's along with a description of how the sober living philosophy of recovery evolved over time. Our 5-year longitudinal study funded by the National Institute on Alcohol Abuse and

Phone (510) 597-3440, FAX (510) 985-6459, E-Mail: DPolcin@ARG.org.

Alcoholism titled, "An Evaluation of Sober Living Houses" is then described. Particular attention is paid to the structure, operations, and purported therapeutic factors of SLH's. Finally, baseline findings from our research that describe the characteristics of individuals entering the houses and 6-month outcomes on 130 residents are presented.

## Definition of Sober Living Houses

SLH's are alcohol and drug free living environments for individuals attempting to maintain abstinence from alcohol and drugs (Wittman, 1993). They offer no formal treatment but either mandate or strongly encourage attendance at 12-step groups. SLH's have been important resources for individuals completing residential treatment, attending outpatient programs, leaving incarceration or seeking alternatives to formal treatment (Polcin, 2006b).

Although there are similarities between SLH's and other residential facilities for substance abusers, such as "halfway houses," there are important differences as well. Unlike many halfway houses, SLH's are financially sustained through resident fees and individuals can typically stay as long as they wish. Because they do not offer formal treatment services, they are not monitored by state licensing agencies. However, many sober living homes are members of SLH coalitions or associations that monitor health, safety, quality, and adherence to a social model philosophy of recovery that emphasizes 12-step group involvement and peer support. Examples of SLH coalitions in California include the California Association of Addiction Recovery Resources (CAARR) in the northern part of the state and the Sober Living Network in the south. Over 24 agencies affiliated with CAARR offer clean and sober living services. The SLN has over 250 individual houses among it membership. Outside of California, the "Oxford House" model of sober living is popular, with over 1,000 houses nationwide as well as a presence in other countries (Jason, Davis, Ferrari & Anderson, 2007). However, because there is no formal monitoring of SLH's that are not affiliated with associations or coalitions it is impossible to provide an exact number of SLH's in California or nationwide.

## The History and Evolution of the Sober Living House Model

The earliest models of SLH's began in the 1830's and were run by religious institutions such as the YMCA, YWCA, and Salvation Army (Wittman, 1993; Wittman, Bidderman & Hughes, 1993). These "dry hotels" or "lodging houses" evolved in part out of the Temperance Movement, which sought ways for individuals to overcome social pressures to drink. These Temperance based SLH's tended to be run by operators and landlords who had strong personal convictions about sobriety. Unlike many contemporary SLH's, residents generally had little input into operations of the facility and landlords/operators frequently encouraged attendance at religious services.

After World War II many metropolitan areas increased in population. Along with a tighter housing market came more widespread alcohol related problems (Wittman, Biderman & Hughes, 1993). At the same time, the era of self help recovery via Alcoholics Anonymous (AA) was emerging. In the city of Los Angeles, recovering AA members opened "twelfth step" houses to address the increased need for alcohol and drug free living environments. Managers of these houses either mandated or strongly encouraged attendance at AA meetings to facilitate residents' recovery. Operations of the house were generally the responsibility or the house manager or owner. By the 1960's Los Angeles supported several dozen such houses (Wittman, Bidderman & Hughes, 1993).

The need for sober housing increased during the 1970's and continues today. Wittman (1993) observed that one reason for the increased need was the decline of affordable housing in metropolitan areas during the mid 70's. Cities decreased rooming houses and single room

occupancy hotels that were frequently used as sober living residences. As a result, there were fewer SLH's available at the time when the need was high.

Other factors that contributed to the need for more SLH's was the deinstitutionalization of psychiatric hospitals without the provision of adequate community based housing (Polcin, 1990) and the decline of residential addiction treatment programs (Wittman, 1993). The result has been an explosion of homelessness. As reviewed elsewhere (Polcin et al., 2004), homelessness affected nearly 6 million people from 1987 to 1993. Conservative estimates indicate 40% suffer from alcohol problems and 15% suffer form drug problems (McCarty et al., 1991). In one county in Northern California, a study of homelessness revealed a lifetime prevalence for substance use disorders of 69.1% (Robertson & Zlotnick, 1997).

### Newer Models of Sober Living Houses

An important exception to the decline of SLH's during the 1970's was the development of Oxford Houses (O'Neill, 1990). When a halfway house for substance abusers in Montgomery County Maryland closed, the clients continued their residence by paying rent and utilities themselves and implementing a shared, democratic style of managing the house. The residents were apparently satisfied with this new arrangement and the model rapidly expanded. While they are common in other parts of the country, they are rare in California, where other types of SLH's existed before Oxford Houses became widespread.

The Oxford House model offers a "social model" recovery philosophy (Kaskutas, 1999) that emphasizes peer support for sobriety and shared, democratic leadership in managing house operations. In addition, Oxford houses are financially independent of outside organizations and are financially self-sustaining. Although residents are not required to attend 12-step groups, they are generally encouraged to do so. Research in Oxford houses indicates that 12-step involvement is high, with about 76% of the residents attending 12-step meetings at least weekly (Nealon-woods, Ferrari & Jason, 1995).

Other types of SLH's have been more varied in their operations. The early "dry hotels" or "lodging houses" in particular were dominated by the influence of landlords or managers. Some SLH's today continue with a "strong manager" model of operations. Often, a person in recovery rents out rooms, collects money for rent and bills, evicts individuals for relapse and either mandates or strongly encourages attendance at 12-step meetings. The potential downfall of these types of houses is they do not capitalize on the strength of peer support and peer empowerment. Fortunately, many contemporary house managers have recognized the value of integrating social model recovery principles into house operations. These houses tend to have a residents council or a similar mechanism for resident empowerment and input into house operations. In California, SLH coalitions such as CAARR and the SLN require evidence of resident involvement in managing operations because peer support and empowerment are thought to be key factors in the success of SLH's.

## An Evaluation of Sober Living Houses

"An Evaluation of Sober Living Houses" is a 5-year study funded by the National Institute on Alcohol Abuse and Alcoholism (Polcin, Galloway, Taylor & Benowitz-Fredercks, 2004). It aims to track 300 individuals over 18 months who live in 20 different SLH's administered by 2 different agencies. This report will focus on 6-month outcomes for 130 individuals residing in 16 sober living houses affiliated with Clean and Sober Transitional Living (CSTL) in Sacramento, California.

Study procedures included recruiting residents for the research within their first week of entering the SLH. All participants signed informed consent documents and were informed that

their responses were confidential. A federal certificate of confidentiality was obtained to further protect study confidentiality. Interviews were conducted at entry into the houses and at 6-month follow-up. We expected residents entering SLH's who had established sobriety would maintain that sobriety, while those with recent substance use would show significant improvement.

Primary outcome measures included the Addiction Severity Index (ASI) (alcohol, drug, medical, legal, family/social, and vocational severity scales) (McLellan, et al., 1992), six month measures of substance use (Gerstein et al., 1994), and the Brief Symptom Inventory to measure psychiatric severity (Derogatis & Melisaratos, 1983). In addition, we examined factors that correlated with outcome. Our protocol includes measures of social support for sobriety (Zwyak & Longabaugh, 2002) and involvement in 12-step groups (Humphreys, Kaskutas & Weisner (1998). To assess for DSM psychiatric diagnostic categories at baseline we used the Psychiatric Diagnostic Screening Questionnaire (PDSQ) (Zimmerman & Mattia, 1999).

Before reporting study findings that compare resident functioning at baseline and 6-month follow up, a description of the houses at CSTL will be provided that emphasizes SLH structure, operations, and philosophy.

## Clean and Sober Transitional Living

CSTL was founded in 1986 by a recovering alcoholic and addict who had lost a brother to addiction and could not find affordable housing that was conducive to recovery. He and several roommates opened their own sober living house and the facility grew to the sixteen houses today. All of the houses are located in a suburb seventeen miles northeast of Sacramento, California. All houses are within a 9 mile radius of each other, which facilitates a sense of community and commitment.

Currently, about 90% of the residents pay their rent using their own funds; about 10% of the residents have their rent paid by SASCA (Substance Abuse Services Coordinating Agency), an agency created for graduates of Substance Abuse Programs in the California Department of Corrections.

CSTL embraces the Alcoholics Anonymous and Narcotics Anonymous philosophy of recovery and requires residents to be active members in those programs. The CSTL goal is to help the addicted person create a new, alcohol and drug-free lifestyle. To accomplish this goal, CSTL offers a long term, continuous clean and sober living environment and a culture of sobriety in a community of peers. Social support for sobriety is emphasized along with "experiential learning," where residents learn strategies from each other about how to succeed in recovery. In addition, residents support each other in informal ways, such as providing suggestions about where to find work or how to seek help for medical or psychiatric problems. Consistent with the principles of social model recovery, residents are empowered through participation in a "Resident Congress."

**Phase System**—One of the ways that CSLT has built upon the traditional sober living house model is through implementation of a phase system. Rather than all residents immediately having the same responsibilities and freedoms as soon as they enter the house, the phase system ensures more structure for new members and increasing freedoms for those who have resided in the house for a longer period. The program has found that increased limits and responsibilities early in the residence helps individuals adapt to the sober living environment. As they develop stability in their residence and recovery they tend to be more successful with the increased freedom and autonomy of phase II.

There are 6 Phase I houses with 71 beds. To minimize isolation and maximize accountability, bedrooms are shared by two or three people. All houses have 4 bedrooms with the exception

NIH-PA Author Manuscript

of the larger main house, which includes offices for the administrative staff and the general manager. This house also has a large community dining room offering home cooked dinners nightly. The fee of $695 for Phase I houses includes rent, utilities, and family style meals.

There are 10 phase II houses and 65 beds, 61 of which have private rooms. Rent is $395 for a shared room and $495 for a private room and includes furniture and utilities; residents are responsible for food.

**Policies and Operations—**Before entering CSTL, prospective residents must have begun a program of recovery. Some may be clean and sober because of incarceration, yet they may be motivated to engage in sustained abstinence from alcohol and drugs. Others residents enter with a recent history of residential treatment, while others have become substantively involved in outpatient or self-help programs. Beyond that, decisions are made on a case by case basis.

All residents begin in Phase I, where they have the most restrictions and demanding chores. Residents in Phase I carry an AA/NA meeting card that is checked for compliance with the expectation that they attend five meetings per week. Residents must abide by a nightly curfew and sign in and out for accountability. To progress to Phase II, a resident must have been in Phase I a minimum of thirty days and have not been reprimanded for any violation of house rules for thirty days. The resident requests the General Manager put them on the waiting List for a Phase II house which usually has a thirty to ninety day wait. Phase II entails fewer restrictions and more freedoms. For example, meeting cards to validate 12-step meeting attendance are not required, there are no curfew requirements, and overnight guests are permitted twice per week.

CSTL offers no form of counseling but requires that residents agree to 7 conditions:

1. not drink any form of alcohol;

2. not use any mind altering substances;

3. attend five 12-step meetings per week;

4. attend the mandatory Sunday Night House Meeting (a two hour meeting where residents share what they did for their recovery that week as well as set goals for the following week and share how their week went overall);

5. obtain a sponsor and be active in a 12-step program;

6. sleep at CSTL at least five nights per week;

7. be accountable for whereabouts when off CSTL property

In addition to abiding by the above seven conditions, residents are required to complete chores and conduct themselves in a manner conducive to and consistent with recovery. Residents are encouraged to find employment if they are not already employed when they move in.

CSTL tests for drugs and alcohol at random in both Phase I and Phase II. If relapse is suspected, the resident is given an opportunity to admit to their use and a urine sample is taken. If the resident denies use and the urinalysis is positive, the resident is immediately terminated from the program. If the resident admits use, the resident is required to leave the property for 72 hrs and then appears before a "judicial committee" made of senior peer residents who then determine whether or not the resident is allowed to stay. Typical consequences for the first relapse are community service activities or attendance at ninety 12-step meetings in ninety days. Grounds for immediate termination include drinking or drug use on the property, taking a fellow resident out to use, acts of violence, and sexual misconduct.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

If residents desire a change in the rules, they can make a request to the Resident Congress which is governed by current residents and alumnae. Residents also have an opportunity for input through their House Manager. The House Manager is a liaison between the residents and the General Manger and advocates for residents. The House Manager is someone who has demonstrated responsibility, integrity, is in good standing with the community and abides by rules and regulations and is chosen by the General Manager.

**Who Goes to CSTL?—**Data from our research on 211 individuals enrolled in the study has been presented at the Addiction Health Services Research (AHSR) Conference (Polcin, 2006, October 23–25). Baseline findings suggest that SLH's serve a variety of individuals in need of an alcohol and drug free living environment that supports recovery. The most common referral source was the criminal justice system (25%), followed by family/friend (23%), self (20%) and inpatient/residential treatment (13%). The role CSTL plays in addressing housing problems for those in the criminal justice system can also be seen in the fact that 35% of the sample indicated that jail or prison had been their usual housing situation over the past 6 months. Few incoming residents reported stable housing over the past 6 months. While 7% reported renting an apartment as their primary housing, 23% reported staying with family or friends and 12% reported homeless as their primary living situation. Ten percent indicate that a residential treatment facility was their primary living situation.

In terms of demographic characteristics, a majority were male (76%), white (72%) and never married (51%). The mean age was 36.5 (10.10).

While residents presented with a variety of substance abuse problems, those with methamphetamine (49%) and alcohol (44%) dependence were the most prevalent. This finding in part reflects the geographic area of the houses in the central valley area of California, an area known to have high rates of methamphetamine abuse. Other substances were less prominent: marijuana (25%) and cocaine (21%).

CSTL provides services to a large percentage of individuals who suffer from psychiatric symptoms. We used the Psychiatric Diagnostic Screening Questionnaire (Zimmerman & Mattia, 1999) to screen for prevalence of sixteen psychiatric disorders. Results indicated widespread mental health problems. Large proportions of the sample met screening criteria for various disorders: social phobia 46%, generalized anxiety 41%, post traumatic stress disorder 38%, major depression 35%, and psychotic disorders 30%. While the screening criteria were significantly lower than the symptom level required for a DSM diagnosis, it does indicate the existence of psychiatric issues that should be assessed and treated.

Despite the high prevalence of psychiatric severity, relatively few residents engaged in psychiatric services. Only 12% reported attending outpatient psychotherapy sessions and only 30% reported receiving psychiatric medications between baseline and 6-month follow up. Attendance in formal outpatient addiction treatment programs was also low, with 80% reporting no alcohol or drug treatment during the 6 month assessment period.

**Six Month Outcomes—**Six month follow up findings have been reported on 130 residents (Polcin, 2006, October 23–25). Findings indicated that residents made important improvements between baseline and 6-month follow up. Despite the finding that 56% had left the houses by the 6 month time point, 40% of the sample reported complete abstinence from alcohol and drugs between baseline and 6-month follow up. An additional 24% reported they had been completely abstinent five of the last six months.

To assess whether residents made improvement between baseline and 6-month follow up we conducted comparisons of study variables between the two time points. Because most of the

variables had data that were not normally distributed, we used a nonparametric analysis, Wilcoxon Signed Ranks Tests for 2 Related Samples. Results showed that residents made significant improvement over the 6-month period in terms of the number of months they used drugs or alcohol (Z=−6.1, p<.001). On average, residents used substances about 3 of the 6 months before entering the sober living houses. That declined by half at 6-month follow up, when they indicated they used substances 1.5 months on average. When we examined only those individuals who relapsed (n=78), we found a significant reduction in the severity of substance use between baseline and 6-month follow up. "Peak Density" (number of days of substance use during the month of heaviest use) (Gerstein et al., 1994) declined from an average of 23 days at baseline to 16 at 6-month follow up (Z=−3.4, p<.01). Other improvements were noted in the number of days worked (Z=−5.0, p<.001), percent arrested (Z=−3.3, p<.01) and severity of psychiatric symptoms (Z=−3.4, p<.01).

Although residents entered the SLH's with relatively low ASI scores for Alcohol (mean=.17) and Drug (mean=.08) scales, there were nonetheless significant improvements at 6 months for alcohol (Z=−2.9, p<.01) and drug (Z=−2.8, p<01) scales. Significant improvement was also noted on the ASI employment scale (Z=−6.1, p<.001) (Polcin, 2006, October 23–25).

**What Factors are Associated with Outcome?**—One of the goals of the research was to identify factors that were associated with outcome. Interestingly, referral source was not associated with outcome and those with criminal justice mandates did as will as those who entered voluntarily (Polcin, 2006b). The two factors that appeared to be the strongest factors associated with 6-month outcome were: 1) measures of psychiatric severity and 2) involvement in 12-step groups (Polcin, 2006, October 23–25).

A modified version of the Alcoholics Anonymous Affiliation Scale was used to assess 12-step involvement groups (Humphreys, Kaskutas & Weisner, 1998). The scale was modified to include other types of 12-step meetings besides Alcoholics Anonymous, such as Narcotics Anonymous. This measure included more than attendance at meetings; it also assessed activities such as getting a sponsor, sponsoring others, participating in meetings, and volunteering for service work (e.g., set up chairs, organize literature, and clean up after meetings). Psychiatric severity was measured using the BSI (Derogatis & Melisaratos, 1983).

Logistic regression models were used to assess whether selected variables from 6-month assessments were associated with 6-month outcome. As Table 1 indicates, involvement in 12-step groups such as Alcoholics Anonymous or Narcotics Anonymous was strongly associated with the number of months individuals used substances over the past 6 months. As involvement in 12-step groups increased, individuals were about half as likely (OR=0.56) to be members of the higher use group (defined as using substances during 2–6 months versus 0 to 1 month).

Involvement in 12-step groups was also a significant predictor of ASI alcohol severity. Table 2 shows that those with more involvement were less likely to be associated with higher alcohol severity (O.R=0.75).

The other variable that was associated with 6-month outcome was psychiatric severity. At 6 months, those with higher psychiatric severity were nearly three times more likely to be members of the high alcohol severity group. As shown in Table 3, psychiatric severity at 6 months also predicted higher ASI drug severity (OR=2.1).

**Limitations**—There are a number of limitations that should be apparent. First, the sample was limited in size, geographic diversity, and type of SLH's studied. Results obtained from other areas of the country, other types of SLH's (particularly "strong manager" houses), or larger sample sizes could yield different results. Second, the study was descriptive and did not

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

include comparison with individuals in a control group. We therefore do not know whether comparable individuals would do better or worse in other types of living arrangements. Finally, the results only examined 6-month outcomes. Whether these results hold up over longer periods of time is unknown.

## Conclusion

The addiction treatment field must progress beyond the types of evidence based treatments recommended in the literature if it is to succeed in helping large number of individuals achieve sustained sobriety. Sober living houses are an excellent example of an underutilized modality that could help provide clean and sober living environments to individuals completing residential treatment, engaging in outpatient programs, leaving incarceration, or seeking alternatives to formal treatment.

This paper has reviewed the historical roots of SLH's along with the evolution of the SLH philosophy of recovery. Findings from our study on SLH's show they are utilized by a variety of individuals and that residents show improvement at 6 month follow up in a variety of areas, including substance use, work, arrests and psychiatric symptoms. While psychiatric severity is high and improves at 6 months, relatively limited numbers of residents receive adjunctive psychiatric services and higher psychiatric severity is associated with poorer outcome. Consistent with the sober living philosophy of peer support for recovery, higher involvement in 12-step groups such as Alcoholics Anonymous was associated with better outcome.

## Acknowledgements

Supported by NIAAA grant R01AA14030.

The authors would like to acknowledge Jeannie Nevin for assistance gathering information about Clean and Sober Transitional Living and Don Troutman, owner and operator, for his consistent support and encouragement of the project.

## References

Derogatis LR, Melisaratos N. The Brief Symptom Inventory: an introductory report. Psychological Medicine 1983;13(3):595–605. [PubMed: 6622612]

Gerstein, DR.; Johnson, RA.; Harwood, HJ.; Fountain, D.; Sutter, N.; Malloy, K. Evaluating recovery services: The California drug and alcohol treatment assessment (Contract No. 92–001100). Sacramento: California Department of Alcohol and Drug Programs; 1994.

Humphreys K, Kaskutas LA, Weisner C. The Alcoholics Anonymous Affiliation Scale: development, reliability, and norms for diverse treated and untreated populations. Alcoholism: Clinical and Experimental Research 1998;22(5):974–978.

Jason LA, Davis MI, Ferrari JR, Anderson E. The need for substance abuse after-care: Longitudinal analysis of Oxford House. Addictive Behaviors 2007;32:803–818. [PubMed: 16843612]

Jason, LA.; Ferrari, JR.; Davis, MI.; Olson, BD.; Alvarez, J.; Majer, J. Need for Community: The Oxford House Innovation; 2005, August; Paper presented at the American Psychological Association Conference; Washington, D.C.

Kaskutas, LA. The Social Model Approach to Substance Abuse Recovery: A Program of Research and Evaluation. Rockville, MD: Center for Substance Abuse Treatment; 1999.

McCarty, D. Keynote Address. Reengineering Our System of Services: Developing and Implementing a Comprehensive and Integrated Continuum of Services. California State Department of Alcohol and Drug Problems; Sacramento, CA. September 6–8; 2006.

McCarty D, Argeriou M, Huebner RB, Lubran B. Alcoholism, drug abuse, and the homeless. Special Issue: Homelessness. American Psychologist 1991;46(11):1139–1148. [PubMed: 1772151]

McLellan AT, Cacciola J, Kushner H, Peters F, Smith I, Pettinati HM. The fifth edition of the Addiction Severity Index. Journal of Substance Abuse Treatment 1992;9(3):199–213. [PubMed: 1334156]

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Case 3:15-cv-02776-WHA   Document 168-52   Filed 08/25/16   Page 58 of 75

Mee-Lee, D. Keynote Address. Reengineering Our System of Services: Developing and Implementing a Comprehensive and Integrated Continuum of Services. California State Department of Alcohol and Drug Problems; Sacramento, CA. September 6–8; 2006.

Miller WR, Zweben J, Johnson WR. Evidence based treatment: Why, what, where, when and how? Journal of Substance Abuse Treatment 2005;29(4):267–276. [PubMed: 16311179]

National Institutes of Health. NIH institute launches national drug addiction treatment clinic trials network. NIH News Release. September 28;1999

Nealon-Woods MA, Ferrari JR, Jason L. Twelve-step program use among Oxford House residents: spirituality or social support in sobriety? Journal of Substance Abuse 1995;7(3):311–318. [PubMed: 8749790]

O'Neill, J. History of Oxford House, Inc. In: Shaw, S.; Borkman, TJ., editors. Social Model Recovery, An environmental approach. Burbank, CA: Bridge Focus, Inc; 1990. p. 103-107.

Polcin DL. Administrative planning in community mental health. Community Mental Health Journa 1990;26(2):181–192.

Polcin DL. Sober Living Houses: potential roles in substance abuse services and suggestions for research. Substance Use & Misuse 2001;36(2):301–311. [PubMed: 11325168]

Polcin DL. Bridging psychosocial research and treatment in community substance abuse programs. Addiction Research and Theory 2004;12(3):275–284.

Polcin, DL. Sober Living Houses after, during, and as an alternative to treatment; Addiction Health Services Research Conference; Little Rock, AK. October 23–25; 2006 October.

Polcin DL. How health services research can help clinical trials become more community relevant. International Journal of Drug Policy 2006a;17(3):230–237.

Polcin DL. What about Sober Living Houses for parolees? Criminal Justice Studies: A Critical Journal of Crime Law and society 2006b;19(3):291–300.

Polcin DL, Galloway GP, Taylor K, Benowitz-Fredericks A. Why we need to study sober living houses. Counselor: The Magazine for Addiction Professionals 2004;5(5):36–45.

Robertson MJ, Zlotnick C, Westerfelt A. Drug use disorders and treatment contact among homeless adults in Alameda County, California. American Journal of Public Health 1997;87(2):221–228. [PubMed: 9103101]

Wittman FD. Affordable housing for people with alcohol and other drug problems. Contemporary Drug Problems 1993;20(3):541–609.

Wittman, FD.; Biderman, F.; Hughes, L. California Department of Alcohol and Drug Programs, ADP 92–00248. 1993. Sober living guidebook for alcohol and drug free housing.

Zimmerman M, Mattia JI. Reliability and validity of a screening questionnaire for 13 DSM-IV Axis I disorders in psychiatric outpatients. Journal of Clinical Psychology 1999;60:677–683.

Zywiak WH, Longabaugh R, Wirtz PW. Decomposing the relationships Between pretreatment social network characteristics and alcohol treatment outcome. Journal of Studies on Alcohol 2002;63(1): 114–121. [PubMed: 11925053]

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

Case 3:15-cv-02776-WHA Document 168-52 Filed 08/25/16 Page 59 of 75

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

**Table 1**

Logistic regression of 6-month variables predicting number of months used any substances at 6-month follow up (0–1 versus 2–6) (N=130)

| 6-month Variable | OR | CI |
|---|---|---|
| AA/NA Involvement | 0.56[***] | 0.43 – 0.73 |

[***] $p < 0.001$, controlling for age, sex, race, and psychiatric severity

**Table 2**

Logistic regression of 6-month variables predicting ASI Alcohol Severity (Dichotomized) (N=130)

| 6-month Variable | OR | CI |
|---|---|---|
| AA/NA Involvement | 0.75[*] | 0.60 − 0.94 |
| Psychiatric Symptoms (BSI) | 2.8[**] | 1.3 − 5.8 |

[*]
$p < 0.05$,

[**]
$p < 0.01$, controlling for age, sex, race and alcohol related social support

*J Psychoactive Drugs*. Author manuscript; available in PMC 2008 October 1.

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

**Table 3**

Logistic regression of 6-month variables prediction ASI Drug Severity (Dichotomized) (N=130)

| 6-month Variable | OR | CI |
|---|---|---|
| Psychiatric Symptoms (BSI) | 2.1[*] | 1.0 – 4.2 |

[*]
$p < 0.05$, controlling for age, sex, race, and drug related social support

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

# EXHIBIT 5

# NIH Public Access
**Author Manuscript**

*Int J Self Help Self Care.* Author manuscript; available in PMC 2015 January 01.

Published in final edited form as:
*Int J Self Help Self Care.* 2014 ; 8(2): 157–187. doi:10.2190/SH.8.2.c.

# The Evolution of Peer Run Sober Housing as a Recovery Resource for California Communities

**Friedner D. Wittman, Ph.D.** and **Douglas Polcin, Ed.D.**
Alcohol Research Group, Public Health Institute, 6475 Christie Avenue, Suite 400 Emeryville, CA 94608-1010

## Abstract

Sober living houses (SLHs) are alcohol- and drug-free living environments that offer social support to persons attempting to abstain from alcohol and drugs. They use a peer-oriented, social model approach that emphasizes mutual support, financial self-sufficiency, and resident involvement in decision making and management of the facility. Although they represent an important response to the increasing call for more services that help sustain abstinence from drugs and alcohol over time, they are an under recognized and underutilized recovery resource. The purpose of this paper is to trace the evolution of sober living houses in California from the early influences of Alcoholics Anonymous (AA) in the 1930's to the establishment of current SLH associations, such as the Sober Living Network in Southern California. The paper describes key events and policies that influenced SLHs. Although initial research on outcomes of SLH residents has been very encouraging, there is a need for more research to guide improvement of structure and operations. The paper concludes with a discussion of implications for the growth of recovery services and for community housing policy.

## Keywords

Sober living houses; social model; recovery housing; peer helping; housing policy

It has long been recognized that recovery from alcohol and drug addiction for some persons requires an alcohol- and drug-free living environment. Exposure to alcohol, drugs, relapse triggers, and friends and family who encourage substance use can derail recovery even for persons who are highly motivated. Recognizing that some persons with alcohol and drug problems lack a living environment supportive of recovery, treatment programs have offered services in residential forums where individuals can live while they receive treatment. Since the 1960's a variety of residential options have emerged that vary in terms of length of stay, organization of the milieu, staffing, and philosophy of recovery. Examples include therapeutic communities (De Leon, 2010), Minnesota Model programs (Anderson, McGovern, & DuPont, 1999), and Social Model programs (Borkman, Kaskutas, Room, Bryan, & Barrows, 1999). All of these modalities include formal services such as recovery groups, individual counseling, and case management delivered by paid staff. This paper focuses on the evolution of a distinct recovery option that does not include formal services

Phone (510) 597-3440, Fax (510) 985-6459, DPolcin@arg.org.

or paid staff on site at the sober living residence, although some recovering residents are likely to be involved with these services off-site and most have a history of receiving some type of formal services. These houses are called free-standing Sober Living Houses or Sober Housing (Polcin & Borkman, 2008). "Free standing" here means the houses are not licensed by any official body, provide no on-site licensed professional services, and conform to local zoning and building safety codes for residential occupancy. These houses are ordinary housing found throughout the local community based on the history and land-use patterns of the city or county. Architecturally, they may be modified large single-family houses, converted duplexes, or remodeled small apartment buildings.

This article describes the evolution of sober housing in California from 1935 to the present. We begin with a description of 12-step housing as it grew directly out of the recovery principles and experiences of Alcoholics Anonymous (AA). The 12-step house is the original free-standing sober housing created, independently owned, and operated by recovering individuals for the sole purpose of supporting daily sober living. The original design ideas and operational practices created a foundation which remains in force today for several different forms of sober housing that have emerged over the last fifty years, including sober houses in California.

The paper then proceeds to review sober housing's relationship to four episodes in the development of California's policy to manage alcohol- and drug-related health and safety problems at the community and state level:

1. The demise of California's system of custodial care for alcoholics in state psychiatric hospitals and local jails (1950s and 1960s).

2. Replacement of the custodial care system with short-term methods for treatment of alcohol/drug dependency in professionally-managed settings that paid little attention to housing. The need for housing and longer term programs gave rise to a community-based social model approach to recovery.

3. Impact of public housing and urban redevelopment policies that denied housing to alcoholics/addicts and destroyed their habitat but eventually also provided essential protections for recovering people's rights to housing (1960s to 1992).

4. Retrenchment of federal and state support for residential treatment settings and housing for people with AOD problems coupled with an increase in California state prison-building between 1980 and 2010.

The paper concludes with discussion of the prospects for sober housing's continuing growth in California today. We review the current status of sober housing associations, the potential role that sober houses could play in responding to court mandated release of a large number of persons currently incarcerated in California State Prisons, and development of "intentional housing" models that might assist individuals with different problems in addition to drugs and alcohol.

## Origins of Sober Housing within the AA Movement and the Formation of 12-Step Houses

The foundations of AA provided the guiding principles for peer-based sober housing: Strict sobriety (no drinking by residents on or off-site), full membership and participation in the community (pay rent and help with household management), fit quietly (anonymously) into the surrounding neighborhood, implement "good neighbor" policies toward the surrounding community, emphasize peer support for recovery, and pursue opportunities for 12-step work in the community.

One limitation of AA was that it did little to address the needs of members who sought a safe and sober place to live while they "worked their program" through the 12 steps. Many had been evicted and lost connections with family and friends. Many communities had limited rental housing stock and almost no alcohol-free housing except for the occasional boarding house or small hotel manager who personally did not rent to tenants who drank. However, an ample supply of low-cost serviceable housing was available in urban cores and other areas left behind in the post-war move to the suburbs. This housing was often poorly managed and was located in declining districts characterized by violence, public inebriation, prostitution, social isolation, and minimal public services. However, much of the physical housing stock was well-designed and durable, and the district often included surprisingly sound neighborhoods. Houses were often conveniently located in neighborhoods close to jobs and public transportation. Bargains were available for the enterprising and discerning house-hunter.

In the late 1940s a handful of experienced AA members who had acquired several years of sobriety started on their own initiative to fill the sober housing gap by providing "12 step" residences. To a large extent they relied on available low-cost housing in economically declining urban areas. Twelve step residences offered everyday living while maintaining strict sobriety policies (no drinking by residents on or off the premises) and encouraging attendance at AA meetings on site or in the community. Sober housing could be seen as a potential safe island rising out of a sea of "wet" neighborhoods characterized by declining businesses, large numbers of bars and liquor stores, and housing stock consisting of single-room occupancy (SRO) hotels, small apartments, and large old houses that had been converted into multi-occupancy dwellings.

In the late 1940s and early 1950s house operators had their pick of locations and house designs conducive to recovery-oriented daily living. They could take advantage of convenient locations and existing large single family houses. They could choose house layouts that were generously-designed large single family wooden houses, many with four or five comfortable bedrooms, large kitchens, and a spacious living room with a side parlor. A discerning eye could see beneath the shabbiness and deferred maintenance that the old buildings were attractive and well built. California houses built several decades earlier with old-growth Redwood were often well constructed and in extraordinarily good shape. Some of the original 12-step houses are still in operation as this is written, such as the First Step Home in San Francisco (http://www.arafirststephome.com/).

The 12 step houses were privately owned and operated independently by recovering people. Referrals came through word of mouth based on the quality of life they offered for sober living and recovery. A house's bond with the community was its quality of sobriety and the personal integrity of its owners. The houses had no contractual connections to treatment programs or to correctional institutions, though they were informally known to the staff of these organizations. At the time, the local (municipal, county) "system of care" for public drunkenness and related misbehavior was based on a network of informal contacts between local public hospitals for general medical service, state psychiatric hospital wards for treatment of alcoholism, and the correction system's local drunk tanks and county jail farms. Chronic drinkers and public inebriates routinely re-cycled through this informal care system from the street to the drunk tank or the detox ward at the local general hospital, then on to a custodial setting either at the county jail farm or the state psychiatric hospital alcoholism ward. After getting sober and starting to regain their health, usually over a period from one to several months, patients/inmates were discharged back to the neighborhoods they had come from. At best there may have been a short-term arrangement for a sober bed, but there was no inter-service discharge planning or continued monitoring. Relapses were routinely expected. The chronic drinkers who cycled through this system repeatedly were characterized as "doing the loop" (Wiseman, 1970).

The 12 step house offered a way off this merry-go-round if the drinker took the initiative to start living sober day-to-day. The houses offered a real prospect for long-term sober living at a very reasonable cost (rental for one's room or bed), for as long as the resident wished, with freedom to come and go to participate as a full member of the surrounding community. The resident's only obligations were to remain sober, pay the rent on time, attend AA meetings, and help around the house.

## Sober Housing and the Collapse of the California Custodial Care System

Prior to the 1950's individuals with serious alcohol or drug problems in California frequently became involved in California's custodial care systems (i.e., state psychiatric hospitals and local jails). However, these systems were in the process of being dismantled at the same time that 12 step houses began to open up. Two major developments sharply reduced the number of custodial beds available to persons with alcohol and drug problems. The changes began in the late 1940s and came into fruition in the late 1950s. First, California was replacing its aging state psychiatric hospital system that provided residential treatment for alcoholism in dormitory-type hospital wards. Second, there were changes in the local custodial system for public drunkenness, which included doing time in city drunk tanks and county jail farms. The purpose of this section is to describe the revamping of state psychiatric hospitals and local jails and their effects on persons with alcohol and drug problems and the prevalence of sober living houses.

### Downsizing state psychiatric hospitals

By the late 1940s state hospital systems across the US including California had crumbled under years of neglect and abuse brought on by a public which refused to approve necessary staffing and maintenance levels. State health and hospital authorities could not provide the upkeep and staff budgets necessary to operate these large and expensive facilities and

became resigned to deferred maintenance, staff cutbacks, and continuing demands for service from the state (Deutsch, 1948). Concerns were being raised about the cumulative effects of therapeutic shortcomings when the facilities were not maintained and did not operate according to high standards (Gruenberg, Brandon, & Kasius, 1966). Additional concerns included subjugation of the individual to the social pressures and institutional demands of the ward environment (Wiseman, 1970) and the potential for over-control, abuse of power, and distortions of social relations based on imbalances of power (Goffman, 1961).

In response to these concerns there were marked reductions in the number of beds in state hospital institutions. Nationally, the number of patients in state psychiatric hospitals dropped from about 560,000 in the mid-1950s to about 100,000 in the mid-1970s (US Department of Health and Human Services, 1999). In California the number of beds fell from 37,500 in 1959 to 22,000 in 1967 (Lyons, 1984). Up to 40 percent of these admissions to state hospitals had problems with alcohol or drugs.

Another factor that led to the downsizing of state psychiatric hospitals was the discovery in the early 1950s of psychotropic drugs to control psychiatric symptoms which otherwise resulted in custodial hospitalization but now many believed could be treated on an outpatient basis. New treatment technologies based on recently-discovered psychotropic drugs and advances in professional outpatient treatment services became increasingly popular with treatment professionals, families, and the public as an alternative to long-term residential treatment services. Calls for action mushroomed into a political process that drove planners to replace the state's institutional custodial care system with a new system of community-based care delivered through local hospitals and clinics primarily on an outpatient basis (Gillon, 2000). Although some patients with chronic psychiatric disorders were able to find appropriate supportive housing in psychiatric halfway houses or board and care homes, many of those with alcohol or drug problems had few choices beyond single room occupancy hotels (Polcin, 1990).

### The Short-Doyle Act: From the state psychiatric hospital to the community clinic

California helped lead the nation forward into the new era of deinstitutionalization of psychiatric patients from state hospitals with the passage of the Short-Doyle Act in 1957. The Act provided assistance to local governments to provide locally-administered and controlled community psychiatric health programs. In 1963 funding levels were increased by the state to boost local participation and expand the scope of services covered. However, California's de-institutionalization movement paid little attention specifically to alcoholics and addicts, although at the time the state psychiatric hospital and the local jail system were the sole public means for residential services to manage alcohol/drug problems. In practical terms, demise of California's state custodial care system for public inebriates meant the end of a system providing sober beds in state psychiatric hospitals and local jails. Although discredited at the time as demeaning and as ineffectual, these beds had served respite and care functions for large numbers of persons with alcohol or drug problems.

**Decriminalization of public drunkenness**

In addition to custodial care in state psychiatric hospitals, many persons with alcohol and drug problems were housed in local jails (drunk tanks) and county work farms that were part of local jail systems. In the 1960s, California cities relied heavily on these institutions as the response to charges of public drunkenness. However, a series of cases led to a US Supreme Court decision finding that chronic inebriation is an involuntary consequence of alcoholism, a disease, so homeless alcoholics arrested for public intoxication could not be convicted (McCarty, Argeriou, Huebner, & Lubran, 1991). Arrests for disruptive behavior while intoxicated or trespassing were then more likely to result in holding drinkers for a few hours without charging them. Judges stopped sentencing chronic drinkers to the county farm systems run by local criminal justice systems. Decriminalization at the community level left many public inebriates on the street and increased pressure on local medical resources for short-term detoxification and emergency care (Sweet, 2012).

**Custodial care changes and the impact on sober housing**

As custodial care systems that housed persons with alcohol and drug problems collapsed there was no corresponding increase in the supply of appropriate housing. Although some individuals released from custodial care did no doubt access 12-step recovery houses, there was no large increase in their numbers. One factor was low income neighborhoods with affordable housing suitable for 12-step houses continued to be sparse. In addition, there was limited outreach from public agencies to 12-step recovery houses as well as limited interest among 12-step house operators to explore prospects for 12-step houses to take a more active role in providing recovery housing.

Some characteristics of the houses themselves made it difficult for them to fill the housing gap created by the demise of custodial care. Since 12-step houses operated on a purely voluntary basis, most would not accept inebriates brought to the door by police. In addition, applicants to sober housing typically had to find a way to begin their sobriety before approaching the 12-step house. Individuals currently using or withdrawing from substances were usually not accepted. Therefore, they needed services for detoxification and establishment of initial sobriety in the community before they could apply for sober housing. These gaps in service were filled by "social model" (Borkman, 1990a) recovery programs that encompassed a broader spectrum of service needs, including detoxification and initiation of abstinence in residential recovery programs.

# Sober Housing and California's Approach to Alcohol and Drug Treatment at the Community Level: The Rise of the Social Model Movement (1970s)

As a result of the deinstitutionalization of patients from state psychiatric hospitals California shifted public treatment for psychiatric illness and alcoholism/drug addiction from residential long-term care in remote settings to outpatient services close to home and community. This new system minimized use of inpatient hospitalization, confining 24-hour care to short-term treatment in specialized residential community facilities. However, state planners responsible for implementing Short-Doyle legislation ended up relying primarily on family members for living arrangements. For persons without family support, which

included many individuals with alcohol and drug addiction, they also relied on federal disability payments or county welfare checks to indigent patients to pay for secure lodging in board and care homes or low-income residences, such as marginal SROs (single-room occupancy hotels). Thus, the new community-based outpatient approach did not work well for many persons with alcohol or drug problems.

To develop community services that were more responsive to persons with alcohol problems California formed the Office of Alcohol Program Management (OAPM) in 1970 (Blacksher, 1990). OAPM was created partly in response to federal legislation (PL 91-616) that in 1970 established the National Institute on Alcohol Abuse and Alcoholism (NIAAA), a national agency for treatment, prevention, and research into alcoholism. The federal legislation required creation of a single state agency that could receive funds for treatment and prevention services and coordinate with the NIAAA on matters of research and public policy.

With support from OAPM, a small group of recovering people in several California communities formed a community of recovery persons who developed a treatment approach that applied AA principles to establishment of a community-level system of recovery. The "California social model" approach to alcohol and drug addiction in the community addressed both sets of issues overlooked by the Short-Doyle legislation: detoxification and management of public inebriation; and provision of residential settings to support recovery for both the short-term and long-term. One useful synthesis of social model recovery summarizes six key "traits" or "characteristics" (Wright, 1990):

- The basis of authority is the experiential knowledge of recovery (rather than expert knowledge)

- Primary therapeutic relationship is between person and program (rather than person/therapist)

- Everyone both gives and receives help (each participant is both consumer and prosumer)

- Basic principles and dynamics of AA create the framework for social model programs

- A positive sober environment is a crucial part of the program operation.

- Alcoholism is viewed as being centered in the reciprocal relationship between the individual and his or her surrounding social unit

## Four community level social model settings

The social model recovery approach in the community included four components operating jointly at the local (primarily municipal) level: Social model detoxification, alcohol recovery homes, sober living houses, and community (neighborhood) recovery centers. The pioneers of social model recovery moved AA-based recovery beyond the individual 12-step house to create a community exoskeleton of recovery-conducive settings organized around alcohol recovery homes (Dodd, 1990; Dodd, 1997). The four kinds of settings comprise the essential "positive sober environment" offered by social model programs to the surrounding

community. Ideally, the program participant flows seamlessly between settings at his/her own pace in pursuit of a personal recovery experience. The following summarizes four types of social model settings essential to community programs.

**(1) Social-model detoxification settings—**In 1970 O'Briant and colleagues (1973) found from demonstration research in the City of Toronto that when alcoholics repeatedly appeared at hospital emergency services providers did not address their needs for subsequent help after detoxification. Patients were quickly discharged back to their customary environment, which resulted in many repetitions of the cycle. "Social model detoxification" was created to distinguish it from the medically-supervised version. The approach relied on a supportive socio-physical setting rather than a medical intervention. The goal was for staff, most themselves in recovery, to link clients to medical, social, housing and AA-oriented recovery services that would initiate longer-term recovery. Detoxification alone without engagement in additional services that helped maintain abstinence was viewed as unacceptable. Operators of this social-model detoxification programs found that only about 5 percent of public inebriates coming through their doors required immediate medical treatment. An analysis of the socio-physical design of the setting provided a model and a guideline for replication of architectural design and physical features of the social model detox setting (Wittman et al., 1976).

**(2) Alcohol recovery homes—**It was clear to proponents of the social model approach that there was a need for residential alcohol recovery services after initial detoxification. Alcohol recovery homes were designed to address this need. Schonlau (1990) proposed a model for physical design and operational features of the alcohol recovery home that was consistent with 12-step residences operated by recovering people. However, the alcohol recovery home was designed to be shorter in duration than 12-step residences and entail more structured groups and recovery activities. These programs provided an intense recovery-oriented residential experience that immersed the participant in a rich round of daily sober living organized around AA principles. The design of the recovery home created a setting that reinforced positive interactions between residents in all aspect of everyday living – eating, sleeping, hygiene, socializing, working on one's own personal recovery program, seeking services and contacts with significant others in the community. Care for the house itself (cleaning, cooking, light maintenance) was part of this experience. The day was punctuated with AA and household meetings and recovery groups in which residents mutually took responsibility for care of the setting and addressed issues of conduct and governance. For Schonlau, "the setting is the service," summed up the essential aspect comment often repeated by members of the California social model community. Or, as another early social model proponent put it, "Recovery for the individual alcoholic does not depend solely upon what happens 'inside' the person, but depends largely upon the personal and social surroundings in which he lives. Recovery homes initiate and encourage a new pattern of social relationships which aid abstinence and personal growth" (Blacksher, 1990, p. 220).

One limitation of this pure social model approach was that it did not meet state licensing and funding requirements for treatment programs. In 1973 OAPM worked closely with several

recovery home providers, organized as CAARH (California Association of Alcohol Recovery Homes), to establish clear objectives that complied with state requirements. These included the establishment of services and procedures required by the state, such as recovery plans, case notes, case management, and individual and group counseling. Although residential recovery houses are still in operation today, length of time in the residences have decreased. Originally, lengths of stay in residential recovery homes were up to one year and in some cases longer. Maximum lengths of stay have shortened significantly in recent years, often to just a few months.

**(3) Free-standing sober housing (Sober Living Houses or SLHs)—**The 12-step recovery houses described earlier in this paper significantly increased in numbers from their origins in the 1940's to the 1970's. Essentially, they used the same recovery approach emphasizing peer support and involvement in 12-step recovery groups. However, at some point the term "sober living houses" became a common designation for these homes. Some operators adopted this new term because they did not necessarily mandate that all residents engage in 12-step recovery groups and they would allow entry of individuals into the homes if they had alternative plans for sustaining abstinence. Unlike residential recovery homes, SLHs were not licensed by the state to provide "treatment" and did not require government funding to survive financially. Thus, they did not need to modify their approach to include professional services (e.g., counseling, case management, etc.) and were able to maintain a more "pure" social model recovery approach.

Sober living houses fit readily into the social model system of care that was emerging in the 1970's. Many alcoholics who successfully completed social model detoxification or residential recovery programs needed to protect their sobriety by living in clean and sober housing in a safe neighborhood. Many faced return to a dysfunctional family, a dangerous neighborhood, or for other economic, legal and social reasons could not gain access to a reliable sober residence on their own. Sober living homes were excellent options for many of these individuals.

Like their forerunners, 12-step houses, SLHs were ordinary housing stock located in residentially-zoned neighborhoods in the surrounding community. Socially and operationally, they functioned similarly to surrounding households. Their one distinguishing feature is that all residents live sober and have signed an individual lease that terminates if they start drinking/using drugs. Typically each resident paid rent (conventionally, as in a rooming house or for an apartment) and has a personal recovery program of some type (usually anchored in AA meetings that are often off-site). The only "program" for the SLH is a weekly meeting to deal with household matters and to keep the household running smoothly.

Some SLHs had a system where day-to-day oversight of the house was provided by residents themselves through a democratically elected resident council. Such a model reflected the social model emphasis on empowerment of the residents rather than large power imbalances between managers and residences. House managers using this approach took care of the physical aspects of the residence (maintenance and capital improvements for the building, furniture and furnishings, equipment, bedding, food, clothing) but largely left

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

management of house rules, enforcement of rules, and recreational activities, and operations (e.g., cooking and cleaning) to the residents themselves. As Schonlau put it, "a good manager manages the residency but not the residents" (Schonlau, 1990, p.73). Permanent house managers (people with extensive recovery experience) managed the place, while current residents managed conduct and operations.

The household was a constantly-flowing social pipeline that mixed newcomers with longer-term residents, all of whom live a unified experience in recovery that encourages residents to help each other informally, at their own pace, as a routine part of daily living. Each resident is encouraged to "work his own program" through the 12-steps or some type of other alternative recovery plan. Usually from five or six to as many as a dozen renters might reside in an SLH – the number would be governed by the size of the property and general zoning occupancy restrictions. The SLH is "free-standing" in that it is part of a regular neighborhood and each resident lives an independent life. The SLH could be managed and owned by an alcohol recovery program or it could be affiliated with an independent owner/operator of the residential property.

**(4) Neighborhood recovery centers (NRC)—**The NRC is a non-residential facility intended to help recovering people engage in sober living as a form of normal living in the surrounding community. The NRC was designed to provide a community setting that supported recovery on a voluntary, self-directed basis. It offered a setting that is readily available and flexible for people at all stages of the recovery cycle and in many different living situations. This includes people completing a stay at an alcohol recovery home (Miller, Manov, & Wright, 1987), people living in sober living residences, and people in recovery residing with family, friends and independently (Matthews & Weiss, 1990).

Neighborhood recovery centers offered conveniently located, comfortable places for informal socializing, education programs, and networking among recovering people to programs to link to jobs, education, legal, and social/health services. The coffee pot symbolizes a welcoming place that encourages people to enter and engage in a variety of recovery-conducive activities (Borkman, 1990). The design of the setting emphasized warmth, informality, easy access, and no hierarchical spaces that would separate staff from participants or to create different classes of participants. A variety of activities and AA meetings were offered, as well as connections to AA meetings held at off-site locations. Heavy emphasis was placed on voluntary participation and volunteer activity to supplement work by a few paid staff. Staff of the NRC required special training and personal skills to create an orderly and welcoming facility under these conditions(Shaw, 1990).

Initially, sponsorship of the NRC setting (i.e., paying for the space and the few paid staff required to operate it) came from county alcohol/drug programs supportive of social-model recovery. However, county sponsorship also resulted in conflicts with social-model programs, which were focused on a voluntary "program of attraction" for recovering individuals. Social model programs resisted county demands to host mandatory DUI classes, court-ordered attendance at AA meetings, and participation in county-organized community prevention initiatives (Shaw, 1990).

**Relationship of "social model" to "medical model" and other approaches**

During the 1970s the community social model approach grew steadily. One important source of support was the California Office of Alcohol Program Management (OAPM) directed by Loran Archer. Additional support was garnered from the Department of Alcohol and Drug Programs (DADP), which was directed by Susan Blacksher from 1978 to 1991. These directors took the initiative to provide opportunities for social model advocates to make their case to the state for financial and regulatory support. The California social model community responded by forming the California Association of Alcoholic Recovery Homes (CAARH), a state-wide organization to advance the interests of the social model community. By the 1980s community social model approaches had become widespread and were competing successfully with clinical and medical treatment programs for county contracts to provide treatment/recovery services.

While there are many areas of agreement and overlap between client-oriented medical and social model principles (Dumont, 1968) (Sweet, 2012), there are also many opportunities for discord, misunderstanding and disagreement. Wright's six "traits" at the start of this section could be viewed as oppositional, appositional, and philosophically in conflict with clinical treatment (medical model) approaches to addiction. Finding workable relationships and bridges across the two approaches is a demanding task.

Questions about whether a workable balance can be found between "medical model" and "social model" approaches that operate independently and in a loosely-connected way, or whether the two sides should cordially agree to disagree on certain fundamental points, continue to the present day. Two major areas of concern stand out: First is the question of credentialing and certifying recovery specialists according to personal recovery experience (social model) or according to discipline-oriented professional/specialist training (professional/technical model). Second is the question of whether localities should designate sober-living recovery residences as routine housing not subject to specialized licensing and inspection requirements (social model, and the approach called for by federal regulations), or whether recovery residences should be especially regulated by some authority other than their recovering operators (professional/technical model). These philosophical and political questions persist while technical questions about the utility of various housing designs and operational practices for recovery outcomes are being scientifically pursued.

**Social model policy for the community: Environmental risk management**

Proponents of social model recovery recognized early on that certain alcohol environments in the community put everyone at high risk-not just alcoholics-for violence, car crashes and other injuries, social conflict, economic exploitation, and youth-related problems. The place-based and setting-oriented social model perspective dovetailed with public health and safety concepts holding that preventive control, management, and design of the entire community alcohol environment should apply to the three environmental domains: (1) where alcohol is sold in retail outlets, (2) public places and events where alcohol is present, and (3) social settings where alcohol is a major factor (Wittman &Shane, 1988).

County alcohol program officials who supported the California social model wanted to extend the scope of social-model thinking to public health and safety agencies and community organizations. That is, they wanted the community's own public agencies and organizations to work jointly to manage their own alcohol/drug environment in a safe, trouble-free manner (Wittman, 1990). They believed recovering people could play a major role in larger official and normative community processes to promote and protect health and safety in the three principal environmental domains of community alcohol availability-retail, public, and social settings (Goldberg & Wittman, 2005). Social modelists became familiar with local tools for community environmental risk management both to promote sober living as a community norm and to protect their own interests, particularly with respect to housing rights for recovering people, a topic covered in more detail in the next section.

## The Influence of Public Policy on Sober Living Houses

All things considered, the 1970's and beyond should have been an exciting time for sober housing to expand. Social model recovery had become increasingly popular and a number of federal laws and policies were favorable for sober living houses. For example, The Fair Housing Act of 1968 prohibited discrimination against occupants by creating a "protected class" of occupants defined by race, color, religion, national origin, age, sex, pregnancy and citizenship. These protections were extended to include sober housing residents sharing a household by protecting their "familial status" (Fair Housing Act Amendments of 1988), and disability due to the disease of alcoholism (Americans with Disabilities Act of 1990). Nominally, definitions of "family" and inclusion of alcoholism as a disability indicated that public housing and urban redevelopment projects included recovering persons living in a dedicated sober environment.

Although there were trends and policies favorable to sober living houses, there were also a number of obstacles. These included 1) the limited stock of affordable housing available for sober living houses, 2) public housing and urban redevelopment policies that reduced the amount of safe affordable housing suitable for sober living houses, 3) the economic recession in the late 1970s and early 1980s that created a wave of homelessness, and 4) the federal government's "war on drugs," which led to large increases in the number of persons incarcerated in jails and prisons as a result of alcohol or drug related problems.

### Public housing/redevelopment projects do not support sober housing

Starting with the Housing Act of 1949, the federal government has provided billions of dollars to assist in slum clearance, urban redevelopment, and construction of housing for low-income people. In practice, federal housing programs have recognized sober housing only through subsidies to recovering individuals through rent subsidies, such as Section 8 certificates, but have not provided direct support for dedicated sober housing projects. To the authors' knowledge, HUD has yet to approve a dedicated sober housing project based on enforceable agreements requiring strict sobriety among the residents. Instead, new public housing and urban redevelopment projects typically ended up destroying habitats for low-income people with alcohol/drug problems. This occurred through "blight" clearance and redevelopment projects in inner-city high density neighborhoods that demolished existing low-income housing stock, such as SROs (single-room occupancy hotels) that were home to

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

NIH-PA Author Manuscript

many chronic poverty-level drinkers and drug abusers, and did not replace the lost housing. In San Francisco, for example, a massive urban renewal project to build the Yerba Buena Center (convention center, art galleries, park, hotels, retail shops) cost approximately 4,000 units of low-cost housing but replaced only a small fraction of them (Peterson, 2005).

Public housing projects were built with federal funds; the state and local jurisdictions were then responsible for maintenance and operations for decades to come. Across the country, local housing authorities proved incapable of undertaking long-term management of large public housing projects built with federal assistance (Bristol, 1991). Local and state authorities were constrained by federal law in their capacity to recoup costs through rent payments from tenants, who were living in poverty in any case. Local government services (including police, social services, health services) were simply not able to keep pace with demands for physical maintenance, building safety and management and protection of tenants (Peterson, 2005; Bristol, 1991). Criminal activity, much of it gang related, became an explosive focal point (Newman, 1972). Starting in the late 1960s, public housing projects in many big cities became synonymous with drug-related gang activity that successfully challenged police authority and overwhelmed local housing site managers (Buntin, 2009). The problems were so severe that several of the very large projects were demolished (Bristol, 1991). Public housing and "the projects" were a dangerous neighborhood for recovering people seeking clean and sober living situations.

### Federal fair housing legislation protects rights to sober housing

The Fair Housing Amendments Act of 1988 protects recovering people to live as a "family" (under the law's definition of unrelated persons living together for a common purpose). This opens the community's housing market for recovering people to reside in any residentially-zoned area, including areas zoned only for single-family houses. Sober living residents have the same rights as other residents living in the area, and so must be treated equally and fairly (must have reasonable accommodation). Sober living residents are protected against NIMBY (not in my back yard) discrimination by landlords, city officials, property owners, etc., who don't want recovering people living nearby. The FHAA prohibits unfounded local ordinances such as conditional use permits (CUPs) that seek to impose special restrictions on residents in recovery on grounds that their activities are a danger to public health and safety. CUP ordinances and similar restrictions require sound evidence, not conjecture, describing the empirical (factually-based) dangers. Since diligently-operated sober living residences are not viewed as problems by their neighbors (and are viewed in positive terms), and generate only a few (if any) police reports, attempts to impose special restrictions through land-use planning ordinances are not upheld by the courts (Parker, 2009).

Sober living operators have learned to fight efforts at restrictive zoning and land-use controls, and occasionally join forces with housing rights advocates and other organizations. These fights are matters of life and death for sober housing, since a loss would both impose highly burdensome practical restrictions and would set precedents allowing redoubled efforts to devalue sober living and the recovery movement. For example, the Sober Living Network (SLN), a Southern California organization dedicated to training and promulgation of sober housing, defeated attempts by the City of Los Angeles to impose unfounded and

*Int J Self Help Self Care*. Author manuscript; available in PMC 2015 January 01.